FIREMAN'S FUND INSURANCE COMPANY, Plaintiff

v.

VIDEFREEZE CORPORATION and DAVID E. CHINNERY
DEVELOPMENT CORPORATION, Defendants

Civil No. 427-1975

District Court of the Virgin Islands

Div. of St. Thomas and St. John

October 15, 1975

287

C. James Jessee, Jr., Esq., and Thomas Alkon, Esq., Christiansted, St. Croix, V.I., *for plaintiff Fireman's Fund Insurance Company*

Grunert, Stout, Hymes & Mayer, Esqs., (John E. Stout, Esq.), St. Thomas, V.I., *for defendants Videfreeze Corporation and David E. Chinnery Development Corporation*

YOUNG, *District Judge*

### MEMORANDUM OPINION AND ORDER

The plaintiff, Fireman's Fund Insurance Company (hereinafter "Fireman's Fund" or "insurer") brought suit for a declaratory judgment to determine the rights and liabilities of the parties under certain contracts of insurance entered into between itself and the defendant insureds, Videfreeze Corporation (hereinafter "Videfreeze" or "insured(s)") and the David E. Chinnery Development Corporation (hereinafter "Chinnery" or "insured(s)"). A six day trial was held in St. Thomas and a jury returned a verdict for the defendants, finding that they, the insureds, did suffer a "direct loss by earthquake" within the contract terms.

Fireman's Fund now comes before this Court bringing a motion for a judgment notwithstanding the verdict (j.n.o.v.) pursuant to Rule 50(b) of the Federal Rules of Civil Procedure or, in the alternative, for a new trial pursuant to Fed. R. Civ. P. 59. A hearing was held on these motions on October 1, 1975, at which time arguments of counsel were heard.

## I

### BACKGROUND FACTS

Defendant Videfreeze, a distributor of frozen foods to hotels and restaurants, leased a building owned by defendant Chinnery for use as a warehouse in its business operations. The building is located in the Sub Base area of St. Thomas, formerly the site of quarrying operations, at the foot of Haypiece Hill.

On June 8, 1972, plaintiff issued a fire insurance policy affording business interruption coverage to defendant Videfreeze and another policy covering merchandise such as frozen foods and meat and other contents for a term of three years. On January 10, 1974, plaintiff issued its standard fire insurance policy to defendant Chinnery for coverage on the building being leased by Videfreeze, also for a term of three years. On April 23, 1974, defendant Chinnery took out a one year fire insurance policy written by Fireman's Fund to cover rental loss on the building. All of these policies contained an "Earthquake Insurance Assumption Endorsement" to provide coverage for "direct loss by earthquake".

The defendants sustained losses as a result of a rockslide which occurred at the building at Haypiece Hill sometime during the early morning hours of December 8, 1974. On April 7, 1974, Videfreeze filed Proofs of Loss under the policies claiming substantial losses which it attributed to an earthquake. Chinnery, though it did not file a formal

proof of loss, submitted to plaintiff a cost estimate of repairs to the building, and in sworn statements its officers stated their belief that the losses were due to an earthquake.

The plaintiff made an investigation of the rockslide and determined that the defendants' losses were not "direct losses by earthquake" within the policy coverage. Furthermore, in its complaint Fireman's Fund expressed the opinion that the rockslide was caused by excessive rainfall during the latter months of 1974.

Fireman's Fund, feeling that this would be the most expedient means of disposing of these claims, brought this declaratory action seeking a determination by this Court as to whether or not the losses sustained by the insureds resulted directly from an earthquake. The defendants' responded by asserting several counterclaims which alleged coverage of the losses under the "Earthquake Insurance Assumption Endorsement".

A bifurcated trial was held in St. Thomas beginning on September 22, 1975, during the first phase of which liability alone was to be determined. A lengthy trial ensued at the close of which plaintiff's motion for a directed verdict was denied.

The jury was instructed that the insurer, plaintiff Fireman's Fund, had the burden of proving by the preponderance of the evidence that the insureds did not suffer "direct loss by earthquake". The jury was further instructed that the earthquake must have been a direct and immediate cause of the loss as opposed to a remote or incidental cause. The jury returned a verdict for the defendants finding that they had suffered direct losses by earthquake. Immediately after the jury was discharged, plaintiff moved for judgment notwithstanding the verdict or, in the alternative, for a new trial.

## II

### THE EVIDENCE

I shall begin my opinion by reviewing the rather involved testimony in some detail. This is not to say that all of the evidence can or will be considered in ruling on the plaintiff's motion for j.n.o.v., but I believe it is helpful to set out the evidence in its entirety for purposes of clarification.

The plaintiff's case consisted of the testimony of four witnesses and various exhibits which were introduced into evidence. The plaintiff's first witness, Nat Wells, while having no special training in geology or seismology (the study of earthquakes), is a civil engineer and architect with nearly forty years of practical experience on St. Thomas as an Assistant Commissioner of Public Works and now in his own engineering practice. Most of Wells' testimony related to detailed rainfall records which he has kept from 1958 until the present time.

It was clear from Wells' testimony that an extraordinary amount of rain fell during the months of October and November of 1974. The total rainfall for the year was 62 inches with 32 inches falling during those two months alone. Wells, based on his personal knowledge of the Sub Base area and Haypiece Hill, expressed the opinion that the rockslide was caused by water saturation.

On cross-examination it was pointed out that less than one inch of rain fell between November 28 and December 8. The defendants attempted to dispute the theory that the slide was caused by water saturation by suggesting that the rocks would have fallen prior to December 8 which was ten days after the end of the heavy rainfall. Wells' testimony with respect to an experiment which he performed outside the courtroom offers a possible explanation. Using rocks taken from the site, Wells tested their water absorp-

tion. He concluded that the rock would absorb 10 per cent of its volume of water, after which instead of being relatively solid, it became more fragile. Thus, one could conclude that between November 27 and December 8 the rock at Haypiece Hill was absorbing water and reaching its saturation point, at which point it was in a fragile state.

The second witness for the plaintiff was a Mr. Vasquez who has been an observer of the seismograph at the Cayey Observatory in Cayey, Puerto Rico for the past 29 years. A seismograph is an instrument which writes a permanent continuous record of earth motion, a seismogram. Richter, Elementary Seismology 210 (1958) (hereinafter "Richter"). The observatory at Cayey is part of a worldwide seismographic network.

The intensity of an earthquake refers to the degree of shaking at a specified place. Richter at 17. The Modified Mercalli Scale (Richter at 137–38) which was admitted into evidence is a listing of perceptions of the intensity of earthquakes based on nearly 120 years of talking to thousands of people. The scale consists of descriptions of the effects which occur at various levels of intensity.

Magnitude is a rating given to the size of an earthquake independent of the place of observation. Richter at 17. The magnitude scale is popularly referred to as the Richter scale. The seismograph at Cayey can pick up earthquakes of sufficient size throughout the world. Vasquez testified that the device at Cayey would record an earthquake in Japan of a magnitude of 5.5.

Cayey, Puerto Rico is about 85 to 90 miles from St. Thomas. The seismograph was in good operating condition on December 7 and 8 of 1974. Vasquez testified that there is no seismographic record of an earthquake occurring on December 8, 1974.

Plaintiff's next witness, Dr. Thomas Donnelly, is an eminently qualified Professor of Geology at the State Uni-

versity of New York. He wrote a dissertation on the geology of St. Thomas and St. John in 1956 which was defended and published in 1966. Dr. Donnelly performed geophysical studies in St. Thomas during the 1960's and became quite familiar with the area around Haypiece Hill.

Dr. Donnelly mentioned three contributing factors in reaching his firm conclusion that the rockslide was caused by water. That the quarrying operations had left the hill unsafe was an important factor in causing the landslide, Donnelly said. The structure of the rocks, which consisted of a bundle of rock strata facing down the hill, makes it much more likely that a slide will occur. Finally, the witness testified that the addition of water makes the rock slippery and gives added buoyancy which lowers the friction and increases the likelihood the rocks will slide down and collapse.

Dr. Donnelly appeared equally certain that the rockslide was not caused by an earthquake. He testified that an earthquake of intensity VII[1] on the Modified Mercalli Scale is necessary to start a landslide. On cross-examination he said that an earthquake of intensity III in St. Thomas would be recorded on the seismograph at Cayey, Puerto Rico. Also on cross-examination the defendants elicited from Dr. Donnelly the Modified Mercalli Scale description of earthquakes of intensities I and II. An earthquake of intensity I is "not felt" and an earthquake of intensity II is "felt by persons at rest, on upper floors, or favorably placed".

The plaintiff's final witness, Dr. John Tomblin, shared Dr. Donnelly's expert credentials in the fields of geology and seismology. Dr. Tomblin is presently the head of seismic research at the University of the West Indies in Trini-

---

[1] The level of intensity on the Modified Mercalli Scale is usually designated by use of Roman numerals. I will follow this practice as an aid in distinguishing intensity from the magnitudes on the Richter scale.

dad. The witness examined Plaintiff's Exhibit No. 10, the seismogram from Cayey for December 8, 1974, saying that no earthquake was recorded between the hours of midnight and 8 a.m. Dr. Tomblin stated, as did Dr. Donnelly, that an earthquake of a Mercalli intensity of VII would have had to occur in St. Thomas to cause the rockslide.

Dr. Tomblin testified that from his own personal observations of 11 years in the Caribbean, only once, on October 8, 1974, in Antigua, had an earthquake triggered a landslide. That was the largest earthquake in the area for many years, of intensity VIII, and the landslide which it caused was very small, consisting of 8 to 10 truckloads of debris. The intensity of an earthquake decreases as you move away from the epicenter of the quake since the level of intensity is based on the perceptions of persons at the place of observation. As such, the Antigua earthquake was intensity IV in Tortola and III or IV in Puerto Rico. When asked if Haypiece Hill was ready to slide due to the rains, would the Antigua earthquake have been sufficient to trigger the landslide, Dr. Tomblin replied in the negative, saying that only an earthquake of an intensity of VII or greater in St. Thomas would be sufficient.

Dr. Tomblin indicated that he would not expect an earthquake close to the surface of the ground in St. Thomas. Almost all earthquakes in the area originate out in the sea bed 50 to 100 miles away in which case any earthquake would have shown up in Cayey. He testified further that if there had been a diminutive earthquake in St. Thomas, it could not have been the cause of the rockslide. With respect to the fault at the Sub Base area, Dr. Tomblin's opinion was that it had nothing to do with the rockslide since there had been no activity of that fault for probably thousands of years.

Dr. Tomblin's final conclusion is worth quoting even if it can be done only as accurately as it is reflected in my bench

notes. He said, or words very close to this effect, "There is no question in my mind that the cause of the rockslide was the continued heavy rain prior to the slide". The plaintiff then sought to have various exhibits admitted into evidence (which shall not be listed here but referred to where otherwise relevant) and then rested its case.

The defendants began their case by calling to the stand —Warren Spiller, the Secretary of Videfreeze and General Manager of their St. Thomas branch. His testimony is not particularly significant for purposes of these motions, except that he did remember a prior rockslide incident which occurred in the latter part of October in 1974 during a rainstorm.

Next to testify was Louis Shulterbrandt the President and Treasurer of defendant Chinnery. Mr. Shulterbrandt also recounted the October 1974 rockslide and the minor damage which was done to the building. The witness explained the shareholding structure of the David E. Chinnery Development Corporation. There are two major shareholders, himself and William Demetree, and two minor shareholders, David Chinnery and Everette Birch. David Chinnery and Birch had given 501 shares of stock to Shulterbrandt and kept only five shares apiece. The witness also explained the lease agreement between Chinnery and Videfreeze.

The third witness called by the defendants was Frank Packard who lives in a house on the north side of the island a few miles from the site of the rockslide. Packard testified that in the early morning hours of December 8, 1974, possibly at midnight or 1:00 a.m., he felt an earth tremor and remarked to his wife, "Here goes the train again". Packard said that he thought nothing of it at the time but when he saw the damage to the defendants' building that Sunday morning, he "knew what caused it". Packard did not men-

tion to Mr. Shulterbrandt that day that he felt an earthquake the night before. Packard explained that he had not told anyone about experiencing an earthquake until the Saturday before the trial "because no one asked me".

On cross-examination Packard repeated the statement that he had never discussed the cause of the rockslide with anyone. He was then shown a statement bearing his signature and dated May 21, 1975, which he had given to a representative of Fireman's Fund (Plaintiff's Exhibit No. 47) in which he said, "I do not know what caused the rockslide but there were heavy rains that might have aggravated the already bad cliff".

The defendants' next witness was Pedro Lopez who lives in a house at the opposite side of the harbor from the rockslide site, at a distance apart of over five miles. The Lopez house has 18 inch thick walls and a reinforced concrete foundation set on rock. Lopez testified that on one occasion (he had no specific recollection of the date) he remembers being awakened by shaking and seeing his house move with reference to the trees outside. He stated that for one minute or more he heard things rattling around in the house, including dishes and glasses, and doors and windows. The cross-examination of Mr. Lopez stressed the fact that he was uncertain as to when he had this experience.

Walter Chinnery, a nephew of David Chinnery, was next to testify for the defendants. Walter Chinnery is the owner of three restaurants and has done business with Videfreeze for ten years. The witness indicated that he was unaware that his uncle, David Chinnery, owned any shares in the defendant Chinnery. Walter Chinnery testified that between 1:00 and 1:30 a.m. on December 8, 1974, while reading, he felt his house shake, the tremor lasting for a duration of one minute. His wife, Inez Chinnery, then took the stand and confirmed her husband's testimony with respect to the tremor. On cross-examination Mrs. Chinnery indi-

cated that the only effect she observed was the shaking of the bed.

The defendants next attempted to qualify two witnesses, Walter Yaude and Wellington Bertolett, as experts for purposes of expressing an opinion with respect to the cause of the rockslide based upon an investigation and report which they had done. The Court ruled that neither man qualified as an expert in geology or seismology, so neither was permitted to testify.

Justus Villa, a civil engineer who came to the Virgin Islands in 1947, was called to testify and then qualified as an expert. Mr. Villa expressed the opinion that the rockslide was not caused by water saturation. His reasoning was that a slide caused by water saturation would occur little by little, rock by rock, and not in a large quantity all at one time.

The final witness for the defendants' case in chief was Dr. Joseph Murphy, a highly qualified seismologist who is now a private consultant and research scientist. Dr. Murphy had never studied land or rockslides with reference to earthquakes, however, this being the first and only time. On direct examination Dr. Murphy explained that an earthquake of magnitude 2 or 2.5 could occur in St. Thomas without being recorded on the Cayey seismograph.

Dr. Murphy also explained the correlation between magnitude and intensity and the relationship between the various levels of magnitudes. He demonstrated by an involved mathematical process that a Richter magnitude 2 corresponds roughly to a Mercalli intensity level II. Dr. Murphy then expressed his opinion that an earthquake caused the rock cliff already weakened by water saturation to slide.

The cross-examination of Dr. Murphy is particularly important. Counsel for plaintiff attempted to have Dr. Murphy indicate with what certainty he could say that the rockslide was caused by an earthquake. Dr. Murphy replied

that his opinion of how the rockslide occurred "could be called a probability". When asked what did he consider a probability, Dr. Murphy responded "one in a thousand or so".

All of the defendants' exhibits were admitted. Then the defendants rested their case. Rebuttal and sur rebuttal evidence followed which I need not discuss.

## III

### JUDGMENT NOTWITHSTANDING THE VERDICT

#### A.

██ The jury of three men and three women returned its verdict, finding plaintiff liable to the defendants. After the jury was discharged, plaintiff moved orally for judgment notwithstanding the verdict pursuant to Rule 50(b) Fed. R. Civ. P. This motion along with the alternative motion for a new trial was later reduced to a written motion and filed within the next few days. The standard for deciding a motion for j.n.o.v. is identical to the standard applied in determining a motion for a directed verdict. Neville Chemical Company v. Union Carbide Corporation, 422 F.2d 1205 (3rd Cir. 1970). Although I denied the motion for a directed verdict*, the identity of the standards of the two motions does not preclude the granting of a motion for j.n.o.v. after denial of a motion for a directed verdict. See, e.g., Seven Provinces Insurance Company, Ltd., v. Commerce & Industry Insurance Company, 65 F.R.D. 674 (W.D. Mo. 1975).

 Motions for judgment notwithstanding the verdict must be sparingly and cautiously granted. Jeanes v. Milner, 428 F.2d 598 (8th Cir. 1970). Full respect must be given to the jury's findings and the judge must be careful not to

---

* The denial was made without a studied application of the standards.

usurp the prime function of the jury as triers of facts. Lind v. Schenley Industries, Inc., 278 F.2d 76 (3d Cir. 1960). As such, the test for a j.n.o.v. motion is a strict one. As stated by the Second Circuit in Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970), it is:

Simply stated it is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.

■■ In determining whether the evidence is sufficient the Court is not free to weigh the evidence, or pass on the credibility of witnesses, or to substitute its judgment of the facts for that of the jury. 9 Wright and Miller, Federal Practice and Procedure § 2524 (1971). Moreover, it is well settled that the party against whom a j.n.o.v. motion is made must be given the benefit of every legitimate inference that can be drawn from the evidence. Denneny v. Siegel, 407 F.2d 433 (3d Cir. 1969). The courts are split on whether a court, in ruling on a motion for j.n.o.v., should consider only evidence favorable to the party against whom the motion is made or whether it should consider all of the evidence. The better rule is probably that the court should primarily consider all of the evidence favorable to the position of the party opposing the motion, but it should also consider unfavorable evidence that is uncontradicted and unimpeached. See 9 Wright and Miller, Federal Practice and Procedure § 2529 (1971).

The existence of an appropriately high standard for ruling on a motion for j.n.o.v. does not mean that such motions should never be granted. "[A] federal trial judge has a heavy responsibility beyond that of being a mere referee at a judicial proceeding." Byce v. American Honda Motor Company, Inc., 59 F.R.D. 63 (W.D. Pa. 1971) (citing, inter alia, Russell v. Monongahela Railway Company, 262 F.2d

349, 353 (3d Cir. 1958)). While recognizing that a court's position vis-a-vis the jury should be one of minimum interference, one commentator has written:

Traditional respect for the jury and its constitutional benison requires that it be allowed to find whatever facts are reasonably suggested by the evidence. The impossibility of defining reasonableness requires that the scope of freedom be left large. But at some point the possibility that twelve jurors may find the facts "unreasonably", and the much greater probability that twelve jurors can misunderstand or happily ignore the law permits and requires judicial control.[2]

■■ So the question is not whether there is no evidence supporting the party against whom the motion is made, but whether there is evidence upon which the jury could properly find a verdict for that party. Reitan v. Travelers Indemnity Company, 267 F.2d 66 (7th Cir. 1959). A mere scintella of evidence is not sufficient to sustain a jury verdict. There must be such evidence as reasonable minds would accept as adequate in support of the conclusions. Seven Provinces Insurance Company Ltd. v. Commerce & Industry Insurance Company, 65 F.R.D. 674 (W.D. Mo. 1975). A jury's verdict should not stand if it is based on totally unreasonable inferences. In Wratchford v. S. J. Groves & Sons Company, 405 F.2d 1061, 1066 (4th Cir. 1969), Chief Judge Haynsworth wrote:

It is true, of course, that somewhere lines must be drawn by a federal judge, for if the inference sought to be drawn lacks substantial probability, any attempted resolution of the question may well lie within the area of surmise and conjecture.

In Denneny v. Siegel, 407 F.2d 433 (3d Cir. 1969) the appellate court reviewed the trial judge's granting of a motion for a directed verdict in a medical malpractice case, agreeing that it could not reasonably be said that the onset

---

[2] Cooper, "Directions for Directed Verdicts: A Compass for Federal Courts", 55 Minn. L. Rev. 903, 921 (1971).

of a post-operative infection was inextricably connected with the act of negligence. The court explained its function as being to examine the record in the light most favorable to the plaintiff and to consider all inferences reasonably capable of being drawn from the evidence. The Third Circuit wrote:

> We must determine whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonable afford relief. 407 F.2d 439.

The jury may not be permitted to reach its verdict on the basis of speculation and conjecture. There must be sufficient facts for the jury to say reasonably that the preponderance favors liability.

B.

■ Having carefully considered the evidence and being mindful of the limited role of a trial judge when reviewing a jury verdict on a motion for j.n.o.v., it is my firm conviction that reasonable minds could properly have reached only one conclusion in this case, that the defendants did not suffer "direct loss by earthquake", and that judgment should be entered for the plaintiff notwithstanding the verdict.

For purposes of this motion the defendants case consisted of four persons who said that they felt an earth tremor, an expert witness who expressed the opinion that the rockslide was not caused by water saturation, and another expert who at least suggested that the reasonable probability of the rockslide being caused by an earthquake was a 1000 to 1. Frank Packard was the first witness to testify that he felt an earth tremor on December 8, 1974. In ruling on this motion this Court is not free to pass on the credibility of the witnesses, but I cannot ignore the fact that Packard was as thoroughly discredited as a witness can be and the jury could not reasonably have based its verdict on his testimony.

301

The second person to have felt an earthquake was Pedro Lopez. He, however, had no recollection of when this experience occurred. Counsel for the plaintiff suggested that Mr. Lopez may have experienced the October 8, 1974, earthquake in Antigua. The only other persons to testify that they felt an earth tremor in the early morning hours of December 8, 1974, were Walter and Inez Chinnery.

██ While this Court is not free to engage in the weighing of evidence in ruling on a motion for j.n.o.v., it may look to uncontradicted and unimpeached evidence which is unfavorable to the party against whom the motion is made, as well as uncontroverted facts. There is no question that there is no seismographic record of an earthquake in the area on December 8, 1974. Dr. Murphy did testify that an earthquake of magnitude 2 to 2.5 could have occurred in St. Thomas and yet not be recorded in Cayey. Consistent with this, Dr. Donnelly testified that an earthquake of intensity III (which roughly corresponds to an earthquake of magnitude 3) in St. Thomas would show up on the seismograph at Cayey. Beyond this there is the testimony of both Drs. Donnelly and Tomblin that it would take an earthquake of intensity VII (an approximate magnitude of 5) in St. Thomas to cause a landslide. Dr. Tomblin elaborated saying that a diminutive earthquake in St. Thomas could not have caused the rockslide. Tomblin also said that even if Haypiece Hill was ready to slide due to the rains the Antigua earthquake (a probable intensity of IV in St. Thomas) could not have caused the rockslide.

The defendants hardly presented substantial evidence in support of their position that an earthquake occurred at all in St. Thomas on December 8, 1974, especially in view of the overwhelming evidence to the contrary. Yet looking at the defendants' evidence alone and taking it in the light most favorable to the defendants, as I must, it is conceivable that a jury could properly find from the testimony of

the defendants' four lay witnesses adequate proof of the existence of an earthquake of some size.

But to take the next step, to say that the earthquake was the cause of the losses suffered by the defendants, one must resort to the purest speculation, conjecture and surmise. At that point it can no longer be said that the jury acted reasonably, so that judicial control is not only permitted, but required. Admittedly the plaintiff had the burden of proving that the insureds did not suffer a direct loss by earthquake. But at some point, after the plaintiff has established by far beyond the preponderance of the evidence that there was no "direct loss by earthquake", the defendants must make some showing that their losses were in fact caused by an earthquake.

Again, both Dr. Donnelly and Dr. Tomblin testified that an earthquake of intensity VII is necessary to trigger a landslide. An earthquake of that intensity would have been recorded on the seismograph at Cayey. An earthquake of an intensity as low as III would have been recorded at Cayey. Dr. Tomblin testified that a diminutive earthquake in St. Thomas could not have caused the rockslide. In fact from his personal observations of 11 years in the Caribbean, Dr. Tomblin stated that only the Antigua earthquake with an intensity of VIII triggered a landslide, and that, a very small one. Finally, there is Dr. Tomblin's testimony that even if Haypiece Hill was ready to slide due to the rains, an earthquake of the size which would not be recorded at Cayey could not have triggered the landslide.

Still I shall consider solely the defendants' evidence to determine whether the jury could have reasonably decided that an earthquake was the cause of the insureds' losses. Basically you have the testimony of four lay witnesses all of whom felt an earthquake and then you have the fact of the rockslide and the damage. Frank Packard claimed that when he saw the damage Sunday morning, he "knew what

caused it". This is an impermissible inference, an unsupported leap, which cannot be made. For the jury to rest its verdict on this inference is nothing but conjecture and speculation in view of the solid evidence that an earthquake of the size which would not be recorded at Cayey could not have caused the rockslide.

Beyond this, there is the timing element. No one was able to testify as to when between the hours of midnight and 8:00 on December 8, 1974, the landslide occurred. Taking, in the light most favorable to them, the testimony of defendants' four lay witnesses who experienced a tremor, it is possible to place the "tremor" between the hours from 1:00 a.m. and 3:00 a.m. This time includes the testimony of Pedro Lopez which I must consider for these purposes as having placed the tremor at or about 3:00 a.m. in the morning of December 8, even though he had no positive recollection of the date. The rockslide, however, could have taken place before the alleged tremor, during the tremor, or several hours later. The additional inference necessary to conclude that the rockslide occurred at or about the same time when these witnesses experienced tremors increases the speculative nature of the jury's verdict. A verdict based solely on conjecture and surmise should not be allowed to stand.

But then there is the testimony of the defendants' own expert, Dr. Murphy, who offered the opinion that the rockslide was caused by an earthquake. On cross-examination Dr. Murphy suggested that the reasonable probability of the rockslide being caused by an earthquake was 1000 to 1. When the plaintiff is given the burden of proving that something did not occur and presents overwhelming evidence that it did not occur, and the defendants' expert witness suggests that there is only one chance in a thousand that it did occur, can a jury reasonably find that the plaintiff has not met its burden of tipping the scales ever so

slightly in its favor? With all due respect to the jury system, at that point I would be neglecting my responsibility as a federal trial judge to permit the verdict to stand.

I have yet to consider the testimony of the defendants' witness Justus Villa who expressed the opinion that the rockslide was not caused by water saturation. Even accepting the opinion as fact for purposes of this motion, the plaintiff was not required to prove that the rockslide was caused by water saturation or by any other factor, only that an earthquake was not the cause of the defendants' losses. Admittedly the easiest way to establish that negative may be to prove the affirmative of something else, but Villa's testimony alone does not provide a reasonable basis upon which the jury could find in favor of the defendants.

The Court placed upon the plaintiff, for policy reasons which I stated in the record, the burden of proving that the defendants did not suffer "direct loss by earthquake". This action arose in an unusual posture, the insurance company suing for a declaratory judgment of non-liability, rather than the insureds bringing suit on the claim. The Court could justifiably have placed upon the defendants the burden of proving that they did suffer "direct loss by earthquake".

The plaintiff accepted and met its burden overwhelmingly. But even without weighing the evidence, without judging the credibility of the witnesses or substituting my judgment of the facts for the jury's, and viewing the evidence in the light most favorable to the defendants and taking all reasonable inferences therefrom, I cannot conclude that the jury could reasonably have found that the plaintiff failed to meet its burden of proving by the preponderance of the evidence that the defendants did not suffer "direct loss by earthquake". I am mindful that a judgment notwithstanding the verdict should only be entered when a judge is firmly convinced that a grave error has been made

and a serious injustice will result. This, in my opinion, is such a case.

Fireman's Fund has made, in the alternative, a motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. Rule 59 provides:

> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . .

When a motion for a new trial is joined with a motion for j.n.o.v., the court is required by Fed. R. Civ. P. 50(c) to rule conditionally on the motion for a new trial when it grants j.n.o.v. in case the judgment notwithstanding the verdict is vacated or reversed on appeal. The court must also specify the grounds for granting or denying the motion for the new trial.

 A motion for a new trial and a motion for j.n.o.v. have wholly distinct functions and different standards govern a judge when ruling upon them. Seven Provinces Insurance Company, Ltd. v. Commerce & Industry Insurance Company, supra. A new trial should not be granted merely because the jury could have drawn different inferences or conclusions or because the judge feels that another result is more reasonable. Fireman's Fund Insurance Company v. Aulco Wrecking Company, 466 F.2d 179 (8th Cir. 1972), cert. denied, 410 U.S. 930 (1973). However, when a jury returns a verdict which is contrary to the clear weight of the evidence, a new trial may be granted. Zegan v. Central Railroad Company, 266 F.2d 101 (3d Cir. 1959).

On grounds that the verdict which the jury returned is contrary to the clear weight of the evidence, I rule that the plaintiff's motion for a new trial should be granted if the judgment entered by this Court is vacated or reversed on appeal. In ruling on the motion for a new trial, as opposed

to the motion for j.n.o.v., this Court is permitted to weigh the evidence. Without reviewing all of the evidence another time, I shall simply state my firm belief that the jury's finding that the defendants suffered "direct loss by earthquake" is overwhelmingly contrary to the clear weight of the evidence. Should this judgment be vacated or reversed on appeal a serious injustice will result if a new trial is not granted.

### ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is hereby

ORDERED:

1. That Plaintiff Fireman's Fund's Motion for Judgment Notwithstanding the Verdict be and the same is hereby GRANTED, with directions to the Clerk of the Court to vacate the judgment entered for the Defendants upon the jury's verdict and to enter judgment for the Plaintiff.

2. That Plaintiff Fireman's Fund's Motion for a New Trial is conditionally GRANTED, said ruling not to affect the finality of the judgment entered above.