**Roma ATKINS, Plaintiff,**

v.

**BLAW KNOX FOUNDRY AND MILL MACHINERY, INC., Defendant,**

v.

**CRUCIBLE INCORPORATED DIVISION OF COLT INDUSTRIES, INC., Third-Party Defendant.**

**Civ. A. No. 76–891.**

United States District Court, W. D. Pennsylvania.

Jan. 21, 1980.

William Caroselli, McArdle, Caroselli, Spagnolli & Beachler, Pittsburgh, Pa., for plaintiff.

Giles J. Gaca, Thomson, Rhodes & Grigsby, Pittsburgh, Pa., for defendant.

Joseph A. Fricker, Jr., Pittsburgh, Pa., for third-party defendant.

## OPINION

SNYDER, District Judge.

In this products liability action, the jury found that a bar straightening machine without a feed-in table or detailed instructions for a feed-in table was in defective condition at the time of sale in 1942, that the purchaser of the machine negligently provided or maintained a feed-in table for use with the machine, and that both events were proximate causes of an accident to Roma Atkins on August 9, 1974, when a steel bar apparently worked its way out of the feed-in table and struck Atkins. After answering special interrogatories,[1] the jury awarded a verdict for the Plaintiff in the sum of $53,187.86. The manufacturer, Blaw Knox Foundry and Mill Machinery, Inc. (Blaw Knox), and the employer-purchaser, Crucible Incorporated, Division of Colt Industries, Inc. (Crucible), have moved for judgment n. o. v. or for a new trial.

Blaw Knox contends that the court must first decide as a matter of law whether a straightener sold without a feed-in table or a design therefor is unreasonably dangerous, and that the court, in the instant situation, should have rejected the Plaintiff's claim. It also urges that since the feed-in table would last only eight to ten years, and the accident happened 32 years after the sale of the straightener the Defendant Blaw Knox cannot be held liable for "not selling something that would have ceased to have been of use long before the accident and could not, therefore, have prevented it any way."

1. The Special Interrogatories and Answers read:

"1. Was the # 0 straightener in a defective condition at the time it was sold by Medart to Defense Plant Corporation in 1942?

    ANSWER 'Yes' or 'No':   Yes

      \*     \*     \*     \*     \*     \*

2. Was the defective condition a proximate cause of the injuries of Roma Atkins on August 9, 1974?

    ANSWER 'Yes' or 'No':   Yes

      \*     \*     \*     \*     \*     \*

3. Was Crucible Incorporated negligent in providing or maintaining the feed table used by Roma Atkins on August 9, 1974?

    ANSWER 'Yes' or 'No':   Yes

      \*     \*     \*     \*     \*     \*     \*

4. Was the negligence of Crucible Incorporated a proximate cause of the accident on August 9, 1974 and the injuries to Roma Atkins?

    ANSWER 'Yes' or 'No':   Yes

5. What amount of damages do you award for:

| | | |
|---|---|---|
| a) | MEDICAL EXPENSES | $ 2407.86 |
| b) | PAIN AND SUFFERING | |
| | Past and Future | $35,000.00 |
| c) | LOST EARNING CAPACITY | |
| | To Date of Trial | $10,500.00 |
| d) | FUTURE LOSS OF EARNING CAPACITY RENDERED TO PRESENT WORTH | $15,280.00" |

Blaw Knox further urges that under the Plaintiff's expert testimony, there was "a high probability" that poor maintenance of the table contributed to the accident and that Plaintiff's expert could not state whether the accident would have happened if the table had been properly maintained. (R.Tr. 58)[2] It thus claims that Plaintiff has proved only that a bar could escape from the table in use when the table was in a worn and improperly maintained condition. Since maintenance was not the responsibility of Blaw Knox, Plaintiff has not proved a basis of liability as against Blaw Knox. Blaw Knox contends even more fundamentally that the Plaintiff failed to prove any defect had caused the accident, but proved only how the accident might have happened under its "defect in construction" theory.

Crucible contends that Blaw Knox wholly failed to prove negligence in maintenance by Crucible. This, they say, arises particularly because Blaw Knox was unable to establish the condition of the table at the time of the accident (although pictures taken some two years later showed missing guards or "dogs") and the Plaintiff's expert was of the opinion that the accident still may have occurred even had all the dogs been intact and the table in perfect condition. Crucible also contends it made a table that followed the suggested design of the manufacturer and could not have been expected to do more.

## I.

At the time of the accident, Roma Atkins, a forty-seven year old, experienced machine operator, was employed by Crucible, and on August 19, 1974 was operating an automatic straightening and polishing machine for steel bars. The steel bars, 9/16 of an inch in diameter and 22 feet long, are rolled from a stacking table onto a feed-in table designed to hold the bars in a long trough, level with the straightener, and are fed by hand to rollers which then pull the bar through. Atkins had passed one bar through the straightener and was passing the next bar through. He watched the bar enter the rolls and when about four feet of the bar had passed into the machine, he turned to his left to roll the next bar into the trough and was struck three or four times causing severe injuries to his right arm and other less serious injuries.

The bar straightening machine was built by Medart Company, predecessor of Blaw Knox, and sold to the Defense Plant Corporation, which controlled the Crucible steel making facility in Midland, Pennsylvania during the war in 1942. The bar straightener, about which there are no complaints, was sold with a manual which stated as to a feed-in table:

"Unless otherwise specified, the customer must provide a feed-in table at the input end of the machine. It is advisable to make the table adjustable in height so the bar may always be fed in at the machine's center line. It is necessary to provide a loop or trough to hold small diameter bars as they enter the machine. This is true since the bars revolve at considerable speed as they feed through the machine, and since the curvature of the bar being straightened is irregular, it might otherwise start to whip excessively."

The straightener had been in continuous operation since 1942, without accident, usually for two eight-hour shifts, five days a week. (The machine continued in use after the accident.) Crucible had moved the machine on three occasions before installing it in its present location in 1962. At the time of the accident, the straightener was being operated with a trough table, but it was not shown where the table came from, although it was clear that it was not supplied by Medart. The table was maintained by Crucible which from time to time replaced worn or broken parts with parts made in its own foundry.

The essence of the testimony of Plaintiff's expert, Dr. James Romauldi, was that steel bars must be straight and true, and

---

2. The testimony of the Plaintiff's expert, Dr. Romauldi, was separately transcribed. References to his transcript will be designated "R.Tr."

the "mill scale" removed from the surface. The bar straightening machine is designed to perform both functions. A bar is drawn between two rollers that are at such an angle that the bar will be drawn into the rollers and turned very rapidly so that "it just essentially bends [the bar] so many times, so rapidly that the bar comes out on the average very straight and the variations are very small" (R.Tr. 6). A feed-in table was necessary to hold the bar in line with the machine and to confine the bar "because it is whipping with very considerable energy and [the feed-in table] prevents [the bar] from breaking, bending, damaging machines in the area, or killing people, or just generally raising havoc." In this case, a feed-in table was not sold as part of the machine, and the manual accompanying the machine gave feed-in table instructions only of a general nature, as noted, without any drawings detailing the construction of the feed-in table.

After analyzing the feed-in table in use, Dr. Romauldi concluded it did not provide a fail safe enclosure system. The whipping action of the bar could oscillate the balance dogs and thereby open them up, permitting the bar to escape. To the contrary of the design of the table in use, Dr. Romauldi referred to a Blaw Knox blueprint (Plaintiff's Exhibit 11), dated 1970, in which the dogs were reversed so that the whipping action of the bar would only tend to tighten the dogs instead of making it possible for the bar to work itself out. "The device on Plaintiff Exhibit 11, in my opinion, is a full closure." (R.Tr. 33) Dr. Romauldi testified there were no engineering principles involved in designing Plaintiff's Exhibit 11 which were not known in 1942. Thus, while Dr. Romauldi found the straightener itself to be quite adequate, it was his opinion that "a part of the machine was not supplied . . . . Essentially the trough is a functional and integral part of the machine, and it is not, in my opinion, a proper design to merely indicate that a trough must be supplied that prevents the bar from flailing around." (R.Tr. 37) In his opinion, the manufacturer should have indicated the direction of rotation, so that the clamps or guards could be designed to permit the dropping of the bar *and* provide complete enclosure of the bar subject to certain forces. "My issue here is kind of a straightforward one. It is a question of what constitutes an extension of a machine and what constitutes functionally an ancillary or auxiliary piece of equipment that might be optional. A trough is not optional." (R.Tr. 39)

On the causation issue, Dr. Romauldi stated that poor maintenance of the feed-in table, particularly failing to replace missing guards, probably contributed to the bar coming out of the trough, by accentuating a "corkscrew effect." However, his conclusion was that if the feed-in table had the fail safe enclosure system, the remaining clamps would have prevented the bar from corkscrewing out of the trough. A portion of Dr. Romauldi's cross examination follows:

"Q    Now, [aren't missing dogs] a dangerous and hazardous condition?

A    Yes. That goes back to my earlier comments that the dogs could be moved over to come out, but that once the bar comes out and begins to violently whip, it will accentuate what I have said over here. I have said there were two tables here. The bar could have come out of the rear table and it would have been not a very pleasant thing because it would have been flailing around at the back of the table, but if the front table were so designed that the bars could not come out then although the bar may have flailed about and did some damage to the table and anyone standing near the rear table, the bars could not have come out of the front table and therefore the clattering would have been heard and the machine could have been shut off, but the action could not telegraph itself all the way down.

Earlier I mentioned this corkscrew effect, that once it comes out the action will corkscrew itself down until it came out the very end.

Q I'm sorry I just asked if we take the dogs off, is not that eliminating the confinement protection device of the dogs?

A Oh, certainly.

Q And we have dogs missing in this particular case, do we not?

A That is correct.

Q And is not that a dangerous condition, the actual removal of the dogs?

A Certainly.

Q Do not the dogs provide some protection?

A Yes."

R.Tr. 55–56.

"Q Now, sir, these conditions on this table, that is the missing captioned receptacles, missing dogs, improperly mounted dogs, do you know if those conditions contributed in any way to the accident?

A I believe there is a high probability that they assisted the bar in coming out, yes.

Q Now, sir, do you know what would happen if we had two tables of this design that were properly maintained, that the C-shaped receptacles were actually in position, all the dogs were there? Do you know if the accident would have occurred under those circumstances?

A This specific accident?

Q Yes sir.

A I don't think there is any way of stating that.

    *    *    *    *    *    *

A . . . I would have to go back and repeat what I said before. Some of those dogs are missing, particularly on the last table farthest from the machine. That could facilitate the bars coming out. Had the remaining clamps been of the type that could not permit the corkscrewing of the bar out of the clamps, then although there would have been a flailing about at the end of the machine which could have been a cause for alarm, the bar would not have come out of the machine, out of the trough all the way down. . . . ."

R.Tr. 58–59.

The maintenance foreman of Crucible, who had previously been a straightener operator, told about moving the machine in 1966 to the building where it was located at the time of trial. He testified that he was familiar with this machine since 1973, and that the only changes made to it from the time of purchase were a few safety additions and, after the accident, the trough was moved closer to the machine (Tr. 136–137).

## II.

We begin our analysis with the question: Whether the sale of a bar straightener without a properly designed feed-in table or design information for the construction of such a feed-in table renders the straightener defectively designed at the time of sale?

Looking to Pennsylvania law, as we must do in this diversity action, *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020, 1023 (1978), points out that the law has experienced a turnaround from the principle of caveat emptor to the view that the supplier of products should be deemed to be "the guarantor of his product's safety" (quoting from *Salvador v. Atlantic Steel Boiler Co.*, 457 Pa. 24, 32, 319 A.2d 903, 907 (1974)). As was stated in *Azzarello*,

"It is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint."

480 Pa. at 557, 391 A.2d at 1026.

It is further stated in *Azzarello*:

"[T]he jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use."

480 Pa. at 559, 391 A.2d at 1027. In a footnote, the Pennsylvania Supreme Court set forth an "adequate" charge to the jury:

" 'The [supplier] of a product is the guarantor of its safety. The product must, therefore, be provided with every element necessary to make it safe for [its intended] use, and without any condition that makes it unsafe for [its intended] use. If you find that the product, at the time it left the defendant's control, lacked any element necessary to make it safe for [its intended] use or contained any condition that made it unsafe for [its intended] use, then the product was defective, and the defendant is liable for all harm caused by such defect.' "

480 Pa. at 557 n. 12, 391 A.2d at 1027 n. 12 (quoting from the Pennsylvania Standard Jury Instructions, 8.02 (Civil), Subcommittee Draft (June 6, 1976)).

The Court determined that, under the Plaintiff's averment of facts, recovery was justified, and under the evidence presented in the instant case, the jury could well find that a feed-in trough table is an essential and integral portion of the bar straightening operation, for without the containment of the bar, the operator was in danger.

Blaw Knox relies on *Verge v. Ford Motor Co.*, 581 F.2d 384 (3rd Cir. 1978). There, the trial court had entered judgment for the plaintiff against the manufacturer of the truck cab and chassis; a garbage truck body had been put on the chassis by another company. The Court of Appeals rejected the plaintiff's contention that the manufacturer of the chassis could be found liable for not installing mirrors and a back-up buzzer appropriate for a garbage truck, holding that where the finished product was the result of substantial work by more than one party, three factors were important in determining responsibility for the absence of a safety device:

1. Trade custom—at what stage is that device generally installed.

2. Relative expertise—which party is best acquainted with the design problems and safety techniques in question. *Cf. Schell v. AMF, Inc.*, 567 F.2d 1259, 1263 (3rd Cir. 1977).

3. Practicality—at what stage is installation of the device most feasible.

There was testimony that in the trade it was the custom to sell straighteners and tables separately and that Crucible had considerable expertise in table design. John Titzel, a Medart sales representative, testified without contradiction (Tr. 265):

Q  Can you recognize any of the equipment in the photographs, sir?

A  I can recognize the straightener. The tables were not made by Medart and were not sold by us.

Q  How do you know that, sir?

A  Crucible Steel had a number of these machines of all various sizes and other machines of that same size, and they had a lot of experience with tables feeding the machines and discharging them. So they preferred to do it their own way, and they would not let us tell them how to do it because they had so many years of experience."

We do not believe, however, that *Verge* is applicable to the present case. First, here we are not concerned simply with the absence of a safety device, but rather the absence of a piece essential to the operation of the machine. The Plaintiff's expert emphasized that the bar straightener could not operate without an adequately designed feed-in table—an essential and integral part of the functioning of the bar straightener. We note that the excessive whipping of a bar during normal use was prophesied by the manufacturer in its own literature, but then the manufacturer failed to provide either the table or the design which might have absolved the manufacturer.[3] Second, and on a related vein, the straightener was

---

3. We also are not here involved with the problem of warning, and even if we had been, our Circuit observed in *Schell v. AMF, Inc., supra,* at 1263: "[A]s a matter of policy, it is questionable whether a manufacturer which produces a machine without minimal available safetyguards is entitled to escape liability by warning of a dangerous condition which could reasonably have been avoided by a better design."

sold in a "finished state", *i. e.*, no substantial modifications of the product by down-the-line manufacturers or users was contemplated. The importance of this distinction was brought out in *Heckman v. The Federal Press Co.*, 587 F.2d 612 (3rd Cir. 1978), where plaintiff's left hand was severely injured when it was caught in a power press. The plaintiff alleged the design was defective because of the lack of an adequate safety device. When the press was purchased, it could be operated in two ways, with hand controls requiring the use of both hands on switches away from the point of operation, or, alternatively, by the use of a foot peddle. The employer purchased the machine with the foot peddle option, and without a guard there was nothing to prevent the hands being placed in the operating area directly under the descending ram. The plaintiff's expert maintained that the defendant should have provided some safeguard for the foot peddle operation and that effective implements were available. Our Circuit distinguished *Verge*, stating that

> "The problem [in *Verge*] was allocating liability among parties who participated in the design and creation of the product —not, as here, where the product has been sold in its finished state and the purchaser is a party."

587 F.2d at 617. Thus, it would be improper for us to analyze the present case under the three factors listed in *Verge*.

Even considering the *Verge* factors, it was clearly practical and feasible for Blaw Knox to provide adequate instruction and performance data in that it had produced such tables and maintained brochures and other information relative to the production of such feed-in tables. In terms of relative expertise, practicality, and potential risk of harm, it was appropriate in this case that the manufacturer of the bar straightener bear the burden of providing every element necessary for safe use of the straightener.

Reviewing the testimony in this case, we find sufficient evidence to support the jury's finding that the manufacturer failed to provide adequate design for the feed-in trough table, that the table in use at the time of the accident was unsafe, that the mechanics of designing a snap clip type of trough which would have prevented the whipping rods from escaping from the trough were within the known principles of engineering during the period of sale, that a rotating bar escaped the confinement of the feed-in table because of inadequate design and hit the Plaintiff several times, and that Crucible's furnishing of the table of inadequate design or construction did not remedy the defect. The Court had previously determined that under the Plaintiff's averment of facts, the machine was unreasonably dangerous within the *Azzarello* test but was careful not to suggest, either in the instructions or in the interrogatories to the factfinders, that they must find the product to be "unreasonably dangerous". See *Mattocks v. Daylin Inc.*, 611 F.2d 30 (3rd Cir. 1979) following *Baker v. Outboard Marine Corp.*, 595 F.2d 176 (3rd Cir. 1979) and *Bailey v. Atlas Powder Co.*, 602 F.2d 585 (3rd Cir. 1979).

### III.

Crucible was brought into this case under a negligence complaint by Blaw Knox, the original strict liability defendant, contending that Crucible was responsible for the Plaintiff's injuries because the feed-in table which he was using was negligently maintained by Crucible, or negligently provided by Crucible for use with the bar straightening machine. We do not think it necessary to discuss Crucible's contention that failure of maintenance was not shown in light of Dr. Romauldi's testimony that the feed-in table was not properly constructed.

Crucible, as the employer, was under a duty to use care in providing reasonably safe working conditions—"a workshop devoid of perilous conditions that serious reflection, reasonable anticipation, and practical scientific preparation can avoid." *Jerdon v. Sirulnik*, 400 Pa. 423, 162 A.2d 202 (1960); *Duffy v. Fischbach & Moore, Inc.*, 386 Pa. 533, 126 A.2d 413 (1956).

There was insufficient evidence to find that Crucible constructed the feed-in table.

However, Crucible chose not to purchase a table from Medart, the manufacturer of the bar straightener, and therefore, Crucible took it upon itself to provide a safe feed-in table. While Dr. Romauldi testified that a basic steel engineer cannot be expected to calculate the forces at work on a bar spinning in the feed-in table trough, he also testified that the phenomena of whipping was known to all engineers, including Crucible's. Furthermore, Crucible had experience in construction and use of feed-in tables. Nevertheless, Crucible provided and maintained a feed-in table without requesting or receiving adequate instructions on design and construction of feed-in tables from the manufacturer of the bar straightener. The jury had a basis for finding Crucible negligent in providing or maintaining the feed-in table.

The Motions for Judgment N.O.V. or for New Trial must be denied. The standard on a motion for judgment n. o. v. as stated in *Fireman's Fund Insurance Co. v. Videfreeze Corp.*, 68 F.R.D. 484, 491 (D.C.V.I. 1975), *reversed in part on other grounds* 540 F.2d 1171 (3rd Cir. 1976), *cert. denied* 429 U.S. 1063, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977), is " 'whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached' " and that conclusion is contrary to the jury's verdict. *See also Denneny v. Siegel*, 407 F.2d 433 (3rd Cir. 1969); *Greenberg v. McCabe*, 453 F.Supp. 765 (E.D.Pa.1978), *aff'd* 594 F.2d 854 (3rd Cir. 1979); *Marder v. Conwed Corp.*, 75 F.R.D. 48 (E.D.Pa.1977). Considering the evidence favorable to the party against whom the motion is made and unfavorable evidence that was uncontradicted and unimpeached, we find a sufficient basis for the jury's findings.

A new trial may be granted where there was substantial error in the admission or exclusion of evidence, error in the court's instructions to the jury, where the jury's verdict was inadequate or excessive, or where the verdict is against the weight of the evidence or where the evidence was legally insufficient to go to the jury. *Marder v. Conwed Corp., supra; Garcia v. Dover Shipping Co.*, 380 F.Supp. 607 (E.D. Pa.1974), *aff'd* 511 F.2d 1393 (3rd Cir. 1975). We cannot find that the verdict of the jury was contrary to the clear weight of the evidence.