JOHN BEXIGA, JR., AN INFANT BY HIS GUARDIAN *AD LITEM* JOHN BEXIGA, SR., AND JOHN BEXIGA, SR., INDIVIDUALLY, PLAINTIFFS-APPELLANTS, v. HAVIR MANUFACTURING CORP., DEFENDANT-RESPONDENT.

Argued January 24, 25, 1972—Decided April 24, 1972.

*Mr. Robert J. Cardonsky* argued the cause for the plaintiffs-appellants (*Messrs. Forman, Forman & Cardonsky,* attorneys).

*Mr. James F. Norton* argued the cause for the defendant-respondent (*Messrs. Lane, Evans & Selikoff,* attorneys; *Mr. James F. Norton* on the brief).

The opinion of the Court was delivered by

PROCTOR, J. This is a products liability case. Plaintiff John Bexiga, Jr., a minor, was operating a power punch press for his employer, Regina Corporation (Regina), when his right hand was crushed by the ram of the machine, resulting in the loss of fingers and deformity of his hand. His father, John Bexiga, Sr., brought this suit against Havir Manufacturing Corporation (Havir), the manufacturer of the machine, for damages in behalf of his son and individually *per quod.* The action was grounded in negligence, strict liability in tort and breach of warranty of fitness of purpose. The trial court dismissed the action at the close

of the plaintiffs' case. The Appellate Division affirmed, 114 *N. J. Super.* 397, and this Court granted plaintiffs' petition for certification. 58 *N. J.* 601 (1971).

The machine which caused the injuries was a 10-ton punch press manufactured by Havir in 1961 and sold that same year to J. L. Lucas & Son, Inc., a dealer, and, at its direction, shipped to Regina. With the exception of a guard over the flywheel there were no safety devices of any kind on the machine when it was shipped. Plaintiffs do not contend that the accident resulted from defective materials, workmanship or inspection. Rather, their theory is that the punch press was so dangerous in design that the manufacturer was under a duty to equip it with some form of safety device to protect the user while the machine was being operated.

In June of 1966, plaintiff John Bexiga, Jr., 18 years of age and a junior in high school, had been employed by Regina at its Rahway plant for about two months, working nights after school. During his employment he operated punch presses and drilling machines for 40 hours per week.

On June 11, 1966, John, Jr. reported for work at 5:00 P.M. and was assigned to operate a drilling machine. He worked on this machine until the 9:30 break, after which the foreman directed him to work on the Havir punch press (which he had never before operated) and instructed him in its use. Thereafter he operated the machine unattended. He testified that the punch press was approximately six or seven feet high with a ram, die and foot pedal.

The particular operation John, Jr. was directed to do required him to place round metal discs, about three inches in diameter, one at a time by hand on top of the die. Once the disc was placed on the die it was held there by the machine itself. He would then depress the foot pedal activating the machine and causing the ram to descend about five inches and punch two holes in the disc. After this operation the ram would ascend and the equipment on the press would remove the metal disc and blow the trimmings away so that

the die would be clean for the next cycle. It was estimated by John, Jr. that one cycle as described above would take approximately 10 seconds and that he had completed about 270 cycles during the 40 minutes he operated the machine. He described the accident as follows:

> Well, I put the round piece of metal on the die and the metal didn't go right to the place. I was taking my hand off the machine and I noticed that a piece of metal wasn't in place so I went right back to correct it, but at the same time, my foot had gone to the pedal, so I tried to take my hand off and jerk my foot off too and it was too late. My hand had gotten cut on the punch, the ram.

Plaintiffs' expert, Andrew Gass, a mechanical engineer, testified that the punch press amounted to a "booby trap" because there were no safety devices in its basic design and none were installed prior to the accident. He added that the accident would probably never have occurred had the machine been properly designed for safety. The only literature accompanying the sale of the machine was a service manual which made no mention of safety devices in the operation of the machinery with the exception of a reference to the guard on the flywheel which was unrelated to the accident. He said there should have been more stress put on the factor of safety but that he did not know what recommendations should be made.

Gass described two "basic types" of protective safety devices both of which were known in the industry at the time of the manufacture and sale. One was a push-button device with the buttons so spaced as to require the operator to place both hands on them away from the die area to set the machine in motion. The other device was a guardrail or gate to prevent the operator's hands from entering the area between the ram and die when the machine was activated. These and other safety devices were available from companies specializing in safety equipment.

On cross-examination Gass conceded that, in accordance with the custom of the trade, presses like the one in question were not equipped with safety devices by the manu-

facturer. Rather, he said safety devices were to be installed by the ultimate purchaser. However, in his opinion the custom of the trade was improper in that the machine was defectively designed for safety and that purchasers "almost never" provided safety devices. Further, he said that large presses were generally equipped by the manufacturer with the push-button device. He said that smaller presses like the one in question were as dangerous to the user as the larger ones. He concluded that the press here involved should have been equipped with a two-hand push-button device as are the larger presses. On cross-examination he was not asked to explain why push-button devices were installed by the manufacturer on the large presses but not on the small ones.

While pointing out that guardrails or gates might have to be "modified" to suit the particular die or part used with the press, Gass stated that the push-button device would not have to be "modified" no matter what die was used. In other words, the push-button device would be appropriate for any of the machine's normal uses. On cross-examination he admitted that if the press were employed to punch holes in a 4-foot pipe a guardrail or gate would impede entry of the pipe into the die area and would have to be removed. He said that in such a case the guardrail or gate would not be needed because in holding the pipe the operator would be standing away from the machine. Further, when questioned as to the suitability of guardrails or gates, or other devices such as magnetic lifters or vacuum tubes to the varied uses of the machine, he stated that the particular operation of the press could dictate which of these devices would be appropriate.

The Appellate Division in affirming the trial court's dismissal held that plaintiffs failed to make out a *prima facie* case under strict liability, breach of warranty or negligence principles. On the issue of strict liability or breach of warranty the Court applied the rule set forth in the *Restatement,* which reads in pertinent part:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." *Restatement, Torts 2d* § 402A (1965).

The Court reasoned that since is was the custom of the trade that purchasers, rather than manufacturers, provide safety devices on punch presses like the one in question, Havir "had no reason to believe that the press would be put to use without some additions, *i. e.,* the installation by Regina of protective devices suitable to whatever manufacturing process the press was to be devoted." 114 *N. J. Super. supra* at 403–404. It also stated that *N. J. S. A.* 34:6–62,[*] in effect at the time of the sale, required the factory owner to equip its power presses with proper guards. *Id.* at 404. It held liability could not be imposed under the *Restatement* rule because the manufacturer did not expect the product to reach the user without substantial change. *Id.* at 403–404.

On the issue of negligence the Appellate Division correctly set forth the applicable principle of law:

A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design. *Restatement, Torts 2d* § 398 (1965).

The Court stated that the trial judge properly precluded the question of whether responsibility for the absence of safety devices was chargeable to Havir from going to the jury. 114 *N. J. Super. supra* at 405. It reasoned, "Since the machine could be used to perform various tasks it conceivably could

[*] Since the sale of the press *N. J. S. A.* 34:6–62 has been repealed and superseded by *N. J. S. A.* 34:6A–3 (*L.* 1965, *c.* 154, § 20, effective September 6, 1966).

require a different group of safety devices in connection with each task." *Id.* at 406. Thus, it held, "[T]he imposition of such a duty upon Havir would have been impractical and that it did not act unreasonably in not equipping the press with safety devices 'on its own.'" *Id.*

■■ Taking as true all evidence supporting plaintiffs' position and according them the benefit of all inferences which can reasonably be drawn therefrom, as we are required to do on a motion for involuntary dismissal at the close of plaintiffs' case, *Dolson v. Anastasia,* 55 N. J. 2, 5–6 (1969), we cannot agree with the Appellate Division's application of the law on either negligence or strict liability on the evidence presented. We have concluded that on either theory the proofs were sufficient to withstand a motion for dismissal.

There is no question but that the punch press here without any safety devices was dangerous to the user. From the evidence as to the guardrails or gates mentioned above we agree with the Appellate Division that it would be impracticable for the manufacturer to equip his presses with all of these protective devices, and therefore improper to place the responsibility for their installation upon the defendant. However, the expert testified that the alternative basic safety device, the push-button guard, would not have to be "modified" to suit the die used with the press and there was no evidence that that device would have to be changed for any of the varied uses of the machine. He was not cross-examined as to whether the push-button device would be inappropriate when the machine was employed to cut holes in a 4-foot pipe or when it was employed for any other operation. Even assuming the two-hand push-button device would be inappropriate if the machine were used to cut a length of pipe, there is nothing in the record which shows that the device could not be partially or completely inactivated on such an occasion.

On the basis of Gass' testimony the jury could infer that the two-hand device was appropriate for every normal opera-

tion of the machine and, thus, that it was not impracticable for Havir to equip its machine with such a device. Moreover, as noted above, the expert pointed out that larger punch presses are equipped by the manufacturer with push-button devices; that smaller presses, such as the one in question, were just as dangerous as the larger ones; and that they should be prepared for safety in the same manner. The jury could infer that the two-hand device was appropriate for all of the operations performed on the larger presses and, since the expert was not cross-examined as to why there should be a difference as to the safety devices provided on the two types of presses, it could also infer that the push-button device was equally appropriate for the normal uses of the smaller presses.

■ As we previously said on the issue of strict liability, the Appellate Division applied the rule set forth in the *Restatement*. To the extent that that rule absolves the manufacturer of liability where he may expect the purchaser to provide safety devices (*Restatement, supra,* § 402A(1) (b)), it should not be applied. Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. The public interest in assuring that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser. The only way to be certain that such devices will be installed on all machines — which clearly the public interest requires — is to place the duty on the manufacturer where it is feasible for him to do so.

■ We hold that where there is an unreasonable risk of harm to the user of a machine which has no protective safety

device, as here, the jury may infer that the machine was defective in design unless it finds that the incorporation by the manufacturer of a safety device would render the machine unusable for its intended purposes. As we have said, the jury could infer from plaintiffs' evidence that it was feasible for Havir to install the push-button device. Therefore, it was error for the trial court to dismiss the strict liability claim at the close of plaintiffs' case.

Of course the question of whether one is negligent depends on whether he acted reasonably under the circumstances of a particular case. Thus, aside from the question of the practicability of Havir's installation of a safety device on the press here involved as to negligence, we must consider whether Havir could reasonably foresee that Regina would not install a safety device. On this issue the custom of the trade — that the manufacturer did not install safety devices but relied on the purchaser to do so — while ordinarily evidential, is not conclusive. *Wellenheider v. Rader,* 49 *N. J.* 1, 7 (1967). Nor would it be conclusive that *N. J. S. A.* 34:6–62 imposed the duty on the purchaser. While Havir may have thought that Regina would have taken adequate precautions to protect its employees or that it would be required to do so by statute, we do not think in view of the circumstances here that Havir had a right as a matter of law to assume such devices would be provided. See *Rhoads v. Service Machine Co.,* 329 *F. Supp.* 367, 376 (E. D. Ark. 1971). As to negligence, we hold that a jury question was presented, and that it was error for the trial court to dismiss the action at the close of plaintiffs' case.

If the jury should find for the defendant on the issue of the defective or negligent design of the machine, the next question for it should be whether the defendant was negligent in failing to attach to the machine a suitable warning to the operator of the danger of using it without a protective device. See *Schipper v. Levitt & Sons, Inc.,* 44 *N. J.* 70, 98–99 (1965).

■■ Because of our disposition of the case it is necessary to consider defendant's contention that John, Jr. was contributorily negligent as a matter of law. Neither court below decided this issue. Contributory negligence may be a defense to a strict liability action as well as to a negligence action. *Ettin v. Ava Truck Leasing, Inc.*, 53 *N. J.* 463, 471–474 (1969); *Cintrone v. Hertz Truck Leasing*, 45 *N. J.* 434, 457–459 (1965); *Maiorino v. Weco Products Co.*, 45 *N. J.* 570 (1965). However, in negligence cases the defense has been held to be unavailable where considerations of policy and justice dictate. See, *e. g., Soronen v. Olde Milford Inn, Inc.*, 46 *N. J.* 582 (1966). And in *Ettin* this Court said that undoubtedly the defense will be unavailable in special situations within the strict liability field. *Id.* at 473. We think this case presents a situation where the interests of justice dictate that contributory negligence be unavailable as a defense to either the negligence or strict liability claims.

The asserted negligence of plaintiff — placing his hand under the ram while at the same time depressing the foot pedal — was the very eventuality the safety devices were designed to guard against. It would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty results in no liability for the very injury the duty was meant to protect against. See *Bahlman v. Hudson Motor Car Co.*, 290 *Mich.* 683, 288 *N. W.* 309 (1939), cited with approval in *Ettin, supra* 53 *N. J.* at 473–474. We hold that under the facts presented to us in this case the defense of contributory negligence is unavailable.

The judgment of the Appellate Division is reversed and the cause is remanded for a new trial.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For affirmance*—None.