**JESUS GARCIA VERGE AND THE COMMISSIONER OF
LABOR OF THE GOVERNMENT OF THE
VIRGIN ISLANDS, Appellee**

v.

**FORD MOTOR CO., ELGIN–LEACH CORP., LEACH CO.,
ISLA VERDE SALES, INC. AND JOHN DOE,**
Ford Motor Co., Appellant

No. 77-1064

United States Court of Appeals

Third Circuit

Argued April 25, 1978

Filed August 8, 1978

JAMES L. HYMES, III, ESQ. (GRUNERT, STOUT, HYMES & MAYER), St. Thomas, V.I., *for appellant*

J. MICHAEL SPENCER, ESQ., Frederiksted, St. Croix, V.I., *for appellee*

Before GIBBONS, GARTH, and HIGGINBOTHAM, *Circuit Judges*

OPINION OF THE COURT

HIGGINBOTHAM, *Circuit Judge*

We must address, in this case, a little-litigated subtlety of products liability law: On whom to place design responsibilities where a product has been manufactured and assembled in more than one stage. Because we conclude that the Ford Motor Company was not responsible for the design defect here, we hold that the district court erred in denying Ford's Motion for Judgment n.o.v.

## I.

The plaintiff, Jesus Garcia Verge, was an employee of the Government of the Virgin Island's Department of Pub-

lic Works Sanitation Division. He worked on a garbage collection crew in St. Croix. On February 23, 1973, while Mr. Verge was standing at the rear of a garbage truck, a co-worker placed a full can of garbage about three feet behind him. Then the driver of the truck, without having received a signal to proceed, without checking to locate the position of Mr. Verge and the other crew members and without any warning to them, put the truck into reverse gear. Mr. Verge was pinned between the truck and the garbage can that had been left behind him. As a result of this accident, he suffered a broken leg.

Mr. Verge filed a complaint against Ford, the Elgin-Leach Corp., Leach Co., Isla Verde Sales, Inc. and John Doe Corp. alleging that his injuries were caused by the defendants in that they:

(a) Designed, manufactured, assembled, distributed and sold the garbage truck in an unsafe condition.

(b) Designed, manufactured, assembled, distributed and sold the garbage truck in a condition unreasonably dangerous for its intended use.

(c) Failed to exercise reasonable care in the adoption of a safe plan or design of the garbage truck, which failure made the truck dangerous for the purposes for which it was manufactured.

[Complaint.] More specifically, it is alleged that the defendants failed:

to equip the truck with mirrors or other devices by which the operator of the truck would be able to ascertain the presence of individuals to its rear, prior to reversing the vehicle. The defendants further failed to equip the garbage truck with an operable buzzer or other device which would warn Jesus Garcia Verge and other persons foreseeably similarly situated that the garbage truck was to be reversed.

Id. A settlement between the plaintiff and Elgin-Leach Corporation and Leach Co. was reached before trial. It does not appear from the record that service of process was ever made upon the John Doe Corporation. Neither

does it appear that Isla Verde Sales, Inc. was ever made party to this action.

The case against Ford was based on Section 402A of the Restatement (2d) of Torts.[1] The jury returned a verdict of $75,000.00 in Mr. Verge's favor. Ford moved for judgment n.o.v., the denial of which is the basis for this appeal.

## II.

Plaintiff's central allegation is that Ford's cab and chassis was defective when it left Ford's hands because it did not contain a warning buzzer that would sound when the truck was put into reverse gear. Plaintiff's expert witness testified that a garbage truck without such a device is unreasonably dangerous.

■■ Any design defect case of this type involves two primary issues: (1) Was there a defect?; (2) If so, who is responsible for it? In finding for the plaintiff, the jury obviously answered the first question in the affirmative, i.e., it found that the absence of a warning device on the garbage truck did render it unreasonably dangerous within the meaning of 402A. This is an issue properly submitted to the jury and we cannot say that its finding is not supported by the evidence. We confront, here, the second issue. More precisely, we must determine whether the responsibility for installing such a device should be placed solely

---

[1] Restatement (2d) of Torts § 402A provides:

   (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
      (a) the seller is engaged in the business of selling such a product, and
      (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
   (2) The rule stated in Subsection (1) applies although
      (a) the seller exercised all possible care in the preparation and sale of his product, and
      (b) the user or consumer has not brought the product from or entered into any contractual relation with the seller.

upon the company that manufactured the cab and chassis, or solely upon the company who modified the chassis by adding the compactor unit or upon both.[2]

█ This court has previously stated: "[W]e believe that the requirement that liability only be imposed where the manufacturer is responsible for the defective conditions is necessarily implicit in § 402A. . . ." Taylor v. Paul O. Abbe, Inc., 516 F.2d 145, 147 (3d Cir. 1975). Where, as here, the finished product is the result of substantial work by more than one party, we must determine responsibility for the absence of a safety device by looking primarily to at least three factors:

1. Trade Custom—at what stage is that device generally installed. See State Stove Mfg. Co. v. Hodges, 189 So. 2d 113 (Miss. 1966), cert. denied, sub nom. Yates v. Hodges, 386 U.S. 912 (1967); Schipper v. Levitt and Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965).

2. Relative expertise—which party is best acquainted with the design problems and safety techniques in question. Cf. Schell v. AMF, Inc., 567 F.2d 1259, 1263 (3d Cir. 1977) ("The expected expertise of the manufacturer in a highly specialized field" is a factor in determining whether the manufacturer is liable for failure to install a safety device.)

3. Practicality—at what stage is installation of the device most feasible. See Taylor, supra; Bexiga v. Havir Mfg. Co., 60 N.J. 402, 290 A.2d 281 (1972); State Stove Mfg. Co., supra.

As we analyze these factors, we will remain mindful of the words of New Jersey Supreme Court Justice Nathan L. Jacobs, in Schipper v. Levitt, supra, 44 N.J. at 99, 207 A.2d at 330: "In developing steps towards higher consumer and user protection through higher trade morality and responsibility, the law should view trade relations realistically rather than mythically."

---

[2] In order to more closely track the language of 402A the issue can be rephrased in terms of whether the truck reached the consumer without "substantial change" or whether the truck was in a "defective condition" when it left Ford's hands. Such rephrasing is, however, of little assistance in determining whether Ford should be held liable for not installing the warning device here.

Before we analyze each of these factors, in order to achieve a more realistic picture of the trade relations here, we must examine how the garbage truck here was obtained by the Virgin Islands' Department of Public Works.

The only evidence we have on this point was provided by the deposition of David Leach, the President of Leach Co. and a director of the Elgin-Leach Corp.[3] He testified that the cabs and chassis are generally purchased from Ford by a dealer. The cab and chassis unit is referred to as the F-700 Model. This model is a multi-purpose vehicle that can be converted for other uses beside garbage collection. Trucks are generally driven from Ford to Leach's plant in Oshkosh, Wisconsin, by "Drive-away" companies which are hired for this purpose. The trucks are accompanied by bills of lading prepared by the manufacturer. They contain Leach's address and are signed by Leach after it inspects the vehicle for damage. The bill of lading for the particular truck involved in the accident here was never entered into evidence. In fact, no documentation relating to any garbage trucks was ever entered into evidence.

When Leach receives the cabs and chassis, it converts them into garbage trucks. This conversion process involves cutting from four to six feet from the chassis; placing the compactor unit onto the chassis and making certain electrical hook-ups.

Leach bills the purchaser of the truck for the compactor unit and the assembly of the unit to the truck. Leach, except for rare occasions, does not itself purchase the trucks. After conversion the truck is shipped to a dealer or ultimate customer.

Leach disclaimed any personal knowledge of how the truck in question got to the Oshkosh plant. He believed that

---

[3] This deposition was read into evidence at the trial.

the purchaser of the truck was the Puerto Rico Iron Works which he believed to be a Ford truck dealer.

We will now examine what the record here reveals as to each of the three factors already delineated as crucial to our analysis.

## 1. TRADE CUSTOM

Plaintiff's counsel specifically asked plaintiff's expert witness whether it was the trade custom that the warning device be installed by the company that manufactured the cab and chassis or by the company that installed the compactor units onto the chassis. Unfortunately, the expert's reply did not answer the question and, when the subject was raised again on cross-examination, no clear answer emerged.[4]

■ The only other evidence pertaining to this issue comes from the testimony of David Leach. He testified that

---

[4] The following is the text of the question asked plaintiff's expert, Mr. Cline, by plaintiff's counsel, Mr. Spencer, and the ensuing cross-examination on this issue by defendant's counsel by Mr. Hymes.

MR. SPENCER: Do you know whether or not back in 1970, or 1971, what the custom in the industry was, with respect to the installation of these devices? In other words, those that did it, did the manufacturer of the frame do it, or did the body builders do it?

MR. CLINE: From my knowledge, the orders for such trucks would be placed with the truck sales agency, who would then supply the truck with the type of body, the compactor body that was specified, along with any alarm devices which were required.

MR. SPENCER: All right, thank you Mr. Cline.

MR. HYMES: Mr. Cline, I had a little difficulty hearing your last answer. Did I understand you to say that in 1970, that the order for such a device as this, would come from the sales agency?

MR. CLINE: It was my, I meant to imply that the order for such a alarm would be placed with a sales agency selling trucks.

MR. HYMES: And the person that wants to buy it tells the sales agency what he wants on his compacting unit?

MR. CLINE: He will give him size compactor that he will require for his needs, and any other special equipment he might want on it.

MR. HYMES: And included among the special equipment would be a device such as that?

MR. CLINE: I don't consider this a special equipment, because it fills a need. When you speak of compactors you have an inherent need for backup alarm device, which has been recognized for many, many years.

MR. HYMES: Well, in 1970 was such a device like this standard equipment in the industry, on this type of vehicle?

MR. CLINE: I haven't made a survey to know whether it is, but it comes with every vehicle that is sold.

his company has installed safety devices, but only when the order from the purchasing agent specifically requested the installation of such a device. Mr. Leach went on to say that such a device is generally installed by the truck manufacturer. Mr. Leach testified, however, only as to his company's experience. There is no evidence of whether his company's experience was shared by the garbage truck industry as a whole, or even of how substantial is Leach's share of that industry. Therefore, Mr. Leach's testimony is not an adequate basis for determining the trade custom in this regard.

## 2. EXPERTISE

■ Since the record is without persuasive evidence of trade custom, we must proceed to analyze the other two factors. The evidence relating to comparative expertise indicates that Leach is more expert than Ford in the design of refuse collection vehicles. David Leach testified that his company does install warning devices. He also testified that his company has been in the garbage collection vehicle business since 1932 and has installed compactor units on hundreds of trucks each year since at least 1954. Except for an unrelated hand tool business, Leach is involved solely in the manufacture and installation of compactor units. There was no testimony relating to Ford's expertise in the design of garbage collection vehicles. There is no evidence that Ford ever installed a warning device of the type in question. There is not even any direct evidence that Ford was aware that any of its F-700 trucks was being converted into refuse collection vehicles. Thus the evidence indicates that Leach is considerably more expert in the design of garbage trucks than is Ford.

## 3. PRACTICALITY

■ Finally it is clear from the record that it is considerably more practical for warning devices to be installed by

Leach rather than by Ford. It is essential to recognize that, by the testimony of plaintiff's own expert witness, the Ford cab and chassis was a multi-purpose vehicle. As such, the topless chassis could be modified for a number of uses that would require no backup buzzer. Thus, if a flat bed were added that allowed unobstructed rear vision, it is difficult to conceive of a legal basis for finding that the absence of a warning device would constitute a design defect. Similarly, if a body were added that was lower than the rear view window or if a body were added that otherwise allowed adequate rear vision, there would be no basis for finding that a design defect was present because of the failure to incorporate a backup buzzer. Thus, we are dealing with a vehicle that was not inherently defective when manufactured, but that became defective solely because of additions made by a company with decades of experience in accomplishing just this type of modification.

A similar situation was addressed in Bexiga v. Havir Manufacturing Corp., supra. There, the trial court and intermediate appellate court had held that the manufacturer of a punch press was not liable for the failure to install a safety device because the machine could perform various tasks and it would be impractical for the manufacturer to install different safety devices for each separate use. The Supreme Court of New Jersey, however, concluded that there was evidence from which the jury could have found that one safety device could be installed for all uses of the machine. Therefore the court held that the trial judge had erred in dismissing the action at the close of the plaintiff's case. The court stated:

Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him.

Bexiga, supra, 60 N.J. at 410, 290 A.2d at 285.[5] Here, however, the evidence is that it would not be feasible to install the safety device in question on all F-700 trucks. Furthermore, there was no evidence that it would be feasible for Ford to determine which trucks were to be converted for refuse collection use. As mentioned, there is no direct evidence that Ford was even aware that the truck in question or any F-700 truck would be used for refuse collection. Since Ford manufactures the F-700 for a variety of uses and Leach's conversion business is solely concerned with garbage trucks, it seems much more practical for Leach to install the warning device. Cf. State Stove, supra (more practical for plumber to install safety appliance on water heater than for manufacturer held not liable); Schipper v. Levitt, supra (similar facts and result).[6]

### III.

◼◼ Thus the evidence in this case shows that Leach is more expert in garbage vehicle design than Ford and that it would be more practical for Leach to install the warning device rather than for Ford to do so. On the facts of this case, plaintiff failed to prove that it was practical for Ford to install such a warning device on all of its vehicles when such a device would not be required for many uses of the vehicle. We recognize there might be different factual situations where a manufacturer could be obligated to install certain devices that have a limited use, but we, under the facts of this case, hold that plaintiff has failed to bring forth proof sufficient to warrant the imposition of liability on Ford. As in Taylor, supra, 516 F.2d at 149, "There is

---

[5] Although the court in Bexiga, seems to distinguish between strict liability and negligence liability for product design, we do not consider the distinction of significance in this context.

[6] We do not suggest that Ford could not foresee that its F-700 chassis would be converted for use as a garbage truck. We emphasize only that Leach was in a much better position than Ford to incorporate the safety features necessitated by such a use.

no dispute in this case with respect to the critical facts, and thus the only issue before us is the legal significance of those facts." We hold that Ford was not responsible for including a backup warning device or other safety device on the F-700 cab and chassis here and is not liable for injuries caused by the absence of such a device. Thus, the district court erred in denying Ford's motion for judgment n.o.v.[7]

The judgment of the district court will be reversed with instructions to grant the judgment n.o.v. in favor of Ford.

---

[7] On appeal, Ford also argued that the district court erred in: (1) not submitting the issue of assumption of risk to the jury; and (2) failing to submit to the jury special interrogatories in order to ascertain the comparative responsibility of each defendant, pursuant to an extension to product liability cases of the doctrines of Gomes v. Brodhurst, 6 V.I. 163, 394 F.2d 465 (3d Cir. 1967), codified at 5 V.I.C. § 1451 (1973). Given our disposition of the case, we do not reach these issues.