174 N.J. Super. 202 (1980)
416 A.2d 57
SHIRLEY MOTT AND OTTO MOTT, HER HUSBAND, PLAINTIFFS-APPELLANTS,
v.
CALLAHAN AMS MACHINE COMPANY ET ALS., DEFENDANT-RESPONDENT-APPELLANT, AND COOPER WEYMOUTH COMPANY ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted February 13, 1980.
Decided March 6, 1980.
*203 Before Judges LORA, ANTELL and PRESSLER.
Miller & Pincus, attorneys for appellants (Marvin Pincus, attorney, of counsel).
*204 Richard A. Amdur attorney for appellant, Callahan AMS Machine Company (Joseph K. Cooney on the brief).
Lynch, Mannion, Lewandowski & Martin attorneys for respondent, Cooper Weymouth Maine, Inc. (Thomas B. Mannion on the brief).
Evans, Koelzer, Marriott, Osborne & Kreizman, attorneys for respondents Sterling Radiator Company, Reed National Corporation and Carl G. Peterson Co. (Harry V. Osborne, II on the brief).
The opinion of the court was delivered by LORA, P.J.A.D.
On March 22, 1974, plaintiff Shirley Mott was injured in the course of her employment for Clevepak Corporation as a "packer" on or near a punch press machine. At the time of her accident steel coil was being fed from a stock reel to the punch press at which she was working. Plaintiff turned and stepped between the reel and the roll feed at a point where the steel coil was running approximately 1/2 inch above the ground from the stock reel to the punch press to which the roll feed was affixed, and the tendon and nerves in her ankle and foot were severed by the sharp stock material.
Plaintiff brought suit against Callahan AMS Machinery Company (Callahan), Cooper Weymouth Company, Cooper Weymouth Maine, Inc., Cooper Weymouth Peterson Inc., Carl G. Peterson Co., Sterling Radiator Company Inc. and Reed National Corporation  all of which, except for Callahan, are related corporations through merger and consolidation. The machinery consisted of a punch press, a double roll feed and a double-motorized stock reel which were ordered by plaintiff's employer Clevepak from defendant Callahan and delivered on November 4, 1970. The punch press was manufactured by defendant Callahan, the roll feed by Cooper Weymouth Company and the stock reel by Cooper Weymouth Maine, Inc. When the roll feed *205 was delivered to Callahan it was attached by bolts to the punch press by Callahan.
Callahan denies that it advised Clevepak how to install this equipment and, more particularly, the distance to be maintained between the stock reel and the punch press. The roll feed and the stock reel could be utilized with machines other than a punch press.
Plaintiff's products liability action is bottomed on alleged defective design in that it failed to provide safety guards between the stock reel and punch press, thereby exposing the steel coil notwithstanding it not only permitted but contemplated that they be far enough apart so as to permit someone to walk between them. The instruction sheet for the motorized stock reel, issued by its manufacturer, Cooper Weymouth Maine, Inc., specified that when its stock reel is used there should be a distance of six to ten feet between the reel and the other machine to which material is being fed.
Callahan, by way of cross-claim, contends Cooper Weymouth was negligent in specifying the distance between the stock reel and punch press without providing a guard or barrier since it knew and should have foreseen that there would be a zone of danger created by the unguarded space. Callahan further asserts that it "simply supplied" both parts to Clevepak and did not inform Clevepak as to how far apart the machines should be when in operation.
Sterling Radiator, Reed National and Carl G. Peterson argued that it was Callahan's responsibility to place safety devices between the reel and the press machine since the reel is designed to feed different kinds of machines and a uniform guard rail would be inappropriate because some materials such as cloth that are fed with the Cooper Weymouth reel are not dangerous.
Summary judgments in favor of the Cooper Weymouth companies were granted below on the grounds that they had furnished only a component part rather than a separate machine *206 and that Callahan sold the punch press, motorized reel and roll feed as a package and therefore was the only defendant responsible for installing safety devices. The remaining controversy between plaintiffs and Callahan was settled. Both plaintiffs and Callahan contend that the dismissal of the complaint as against all other defendants was error since there was a genuine issue of material fact as to the liability of the Cooper-Weymouth defendants precluding summary judgment. Defendants counter that as manufacturers of a component part, they may not be held liable for injuries proximately resulting from a design defect in a final assembled product.
Aside from the question of whether the stock reel and roll-feed furnished by the Cooper Weymouth defendants are component parts of the drill press rather than a separate machine used in tandem as a unit to perform the function of manufacturing the bottoms of chocolate cans, under the circumstances of this case there is a proper jury question as to the strict liability of the manufacturers of the stock reel and roll feed for their alleged defective design in failing to provide for a safety device between the motorized reel and the roll feed which was bolted to the punch press. See, Prosser, Law of Torts (4 ed. 1971), § 101 at 664; 2 Frumer & Friedman, Products Liability, § 16A[4][b][i] at 3B 38.2 (1979).
In Roy v. Star Chopper Co., Inc., 584 F.2d 1124, 1134 (1 Cir.1978), cert. den. 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979), the court, in ruling on Star Chopper's objection to the District Court's failure to instruct the jury that, as a manufacturer of a component part, it could not be held liable, held that the law was clear that a manufacturer of a component part could be held liable under strict liability. In that case plaintiff was injured by a motorized "take up" unit (two motor-driven pinch rolls and a spool) manufactured by Star Chopper and which had no safety guards. The Roy court noted that there was "considerable uncertainty" as to whether the "take up" unit *207 was self-contained or a component. 584 F.2d at 1134, n. 12. The same uncertainty is present in the case at bar.
In Verge v. Ford Motor Co., 581 F.2d 384 (3 Cir.1978), plaintiff had been pinned under a garbage truck that had been put into reverse gear. Ford had supplied the cab and chassis to a corporation (Leach) which then manufactured the garbage truck. Plaintiff had settled with that manufacturer. Ford appealed the trial court's denial of entry of a judgment n.o.v. in its favor. Plaintiff's central allegation was that Ford's cab and chassis was defective when it left Ford's hands because it did not contain a warning buzzer that would sound when the truck was put into reverse gear. Plaintiff's expert witness testified that a garbage truck without such a device is unreasonably dangerous.
The court stated the issue on appeal to be whether the responsibility for installing such a safety device should be placed solely upon the company that manufactured the cab and chassis, or solely upon the company that modified the chassis by adding the compactor unit or both. It went on to state
... Where, as here, the finished product is the result of substantial work by more than one party, we must determine responsibility for the absence of a safety device by looking primarily to at least three factors:
1. Trade Custom  at what stage is that device generally installed. See State Stove Mfg. Co. v. Hodges, 189 So.2d 113 (Miss. 1966), cert. denied, sub nom. Yates v. Hodges, 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (1967); Schipper v. Levitt and Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965).
2. Relative expertise  which party is best acquainted with the design problems and safety techniques in question. Cf. Schell v. AMF, Inc., 567 F.2d 1259, 1263 (3d Cir.1977) ("The expected expertise of the manufacturer in a highly specialized field" is a factor in determining whether the manufacturer is liable for failure to install a safety device.)
3. Practicality  at what stage is installation of device most feasible. See Taylor, supra; Bexiga v. Havir Mfg. Co., 60 N.J. 402, 290 A.2d 281 (1972); State Stove Mfg. Co., supra.

As we analyze these factors, we will remain mindful of the words of New Jersey Supreme Court Justice Nathan L. Jacobs, in Schipper v. Levitt, supra, 44 N.J. at 99, 207 A.2d at 330: "In developing steps towards higher consumer and user *208 protection through higher trade morality and responsibility, the law should view trade relations realistically rather than mythically." [at 386-87]
In reviewing the evidence and entering judgment n.o.v. in favor of Ford, the court found that there was not an adequate basis for determining the trade custom; that the garbage truck manufacturer had more expertise than Ford in the design of refuse collection vehicles and installation of warning devices, and that it was much more practical for warning devices to be installed by the garbage truck manufacturer than by Ford.
The Verge court, in discussing the "practicality" prong of the three-part test, relied on the reasoning of Bexiga v. Havir Mfg. Corp., 60 N.J. 402 (1972), but distinguished Bexiga on the facts. In Bexiga the trial court and the Appellate Division had held that the manufacturer of a punch press machine could not be strictly liable for failure to install a safety device because the machine could be used to perform various tasks and it would be impractical for the punch press manufacturer to install different safety devices for each separate use, 60 N.J. at 408-409. The Supreme Court, however, concluded that there was evidence from which a jury could have found that one safety device (a two-hand push button) could be installed for all uses of the machine. The court stated:
Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. [at 410].
Thus, the court stated, the trial judge had erred in granting defendant's motion for an involuntary dismissal at the close of plaintiff's case.
The Verge court noted, however, that the evidence in the case before it was that it would not be feasible to install the safety devices in question on all F 700 trucks and that there was no *209 evidence that it would be feasible for Ford to determine which trucks were to be converted for refuse collection use; hence it was more practical for Leach to install the warning devices.
It should be noted that Cooper Weymouth Maine has taken the position that the "finished product" language in Bexiga limits the liability to Callahan. But we are of the view, as was the Verge court, that Bexiga should not be read so narrowly.
Our review of the record discloses that there are factual issues to be determined in applying the three-part test of Verge. As to trade custom, the report by plaintiff's expert stated:
As a general rule of good safety practice, wherever there is a situation that is a continuous source of danger, one does not depend on the employee to exercise undue continuous caution. It behooved the manufacturers to safeguard the danger zone in order to eliminate, or at least, to minimize the hazard. This procedure is standard practice, and many of the components of the press and take-off reel are so guarded.
Both manufacturers are obviously aware of the necessary physical separation and the creation of the expanse of slack stock. Both are also aware of the burrs and sharp edges that are prevalent on thin steel stock since Cooper Weymouth manufactures equipment that eliminates these sharp edges, and it is highly probable that Callahan has sold such equipment as part of a package. These sharp edges are common knowledge in the metal working industry.
The vice-president of Cooper Weymouth stated in his deposition, however, that he had never seen or heard of a safety device or guard of the material or stock that would go between the motorized reel and punch press. Then too, it is noted that the Bexiga court stated that the fact that it was a custom of the trade that the purchaser and not the manufacturer installed safety devices was only evidential and not conclusive. Id. at 411. As to expertise and practicality, the record is devoid of anything to support a finding therein.
In this respect, the report of plaintiff's expert stated:
In regard to Cooper Weymouth, it is, of course, very evident that their equipment must be operated utilizing a separation. In regard to Callahan AMS, they *210 sold a "package", and thus were certainly aware of the conditions. Furthermore, the press, as factory fitted, was designed to be used in an automatic feed mode which made them as aware as Cooper Weymouth of the operative conditions.
It is our considered opinion that a plenary trial must be held to determine whether the facts to be developed at that trial will support the imposition of a duty on the Cooper Weymouth companies to install a safety device or to exercise a standard of conduct commensurate with a reasonably foreseeable hazard. See Essex v. New Jersey Bell Tel. Co., 166 N.J. Super. 124 (App.Div. 1979) (whether telephone company exercised its duty to ensure that plaintiff would not trip over phone cord was not appropriately decided by summary judgment).
Although the parts in question were manufactured by Cooper Weymouth Maine and Cooper Weymouth Company, the other named defendants are all related by merger or consolidation. As successor corporations they are responsible for the product liability claims against their predecessor. Ramirez v. Amsted Industries, Inc., 171 N.J. Super. 261 (App.Div. 1979), certif. granted 82 N.J. 298 (1980). See, also, Jackson v. N.J. Mfrs. Ins. Co., 166 N.J. Super. 448, 454 (App.Div. 1979).
Defendants Sterling et als. contend that plaintiffs and Callahan have no right of appeal since the action was voluntarily dismissed with prejudice by plaintiff-appellants and Callahan. However, the transcript of the settlement proceedings establishes that the dismissal entered following the Callahan settlement operated as a dismissal only against Callahan and not as against all of the other defendants. At that juncture only Callahan was left in the case since summary judgments had been entered in respect of the Cooper group defendants. The interlocutory summary judgments in favor of those parties are obviously viable in terms of ripeness for appeal.
*211 Reversed and remanded to the Law Division for trial and further proceedings consistent with this opinion. Jurisdiction is not retained.