John POWELL

v.

E. W. BLISS COMPANY.

Civ. A. No. 77–696.

United States District Court, E. D. Pennsylvania.

June 19, 1981.

Christopher C. Fallon, Philadelphia, Pa., for plaintiff.

Austin Hogan, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

■ In this products liability action, the jury returned a verdict in favor of the defendant. Presently before me are plaintiff's motions for judgment n.o.v. and for new trial in which he contends that I erred both in my charge to the jury and in several of my evidentiary rulings.[1] After careful consideration of the matters raised by the plaintiff, I have concluded the motions must be denied for the reasons that follow.

The plaintiff was employed as a punch press operator for the Penn Construction Company ("Penn"). His job required him to pick up 10–12″ pieces of flat metal with his left hand, place them in the work area of the punch press, and then activate the press by stepping on a foot pedal. (Tr. 52–54). The pedal engaged a clutch which caused the ram on the press to descend. (Tr. 70). This in turn caused a die, which was attached to the ram, to strike the metal pieces forming them into U shaped metal parts. The ram would then go back up and plaintiff would reach into the work area with his right hand, remove the newly formed metal piece, throw it into a nearby can, and repeat the process. (Tr. 54).

On August 27, 1975, the ram on the press inexplicably[2] descended while plaintiff's left hand was within the work area, cutting off a portion of his left middle finger and the tip of his index finger. He commenced the instant action against the manufacturer of the punch press[3] contending the press was defective within the meaning of Restatement (Second) of Torts § 402A (1965)[4] because it was not equipped with safeguards designed to keep the operator's hands out of the work area while the flywheel was engaged, with warnings regarding the danger of operating the press without such safeguards, or with instructions to the employer regarding the necessity of providing safeguards. At trial, the plaintiff introduced a considerable amount of evidence pertaining to the feasibility of incorporating various types of point of operation safeguards into the machine which, he contended, defendant was obligated to include on the press in order to make it safe for its intended use. Defendant did not seriously contest the assertion that some type of safeguarding was essential to the safe operation of the press. Rather, the entire thrust of its case was that the press was manufactured and sold as a general purpose, multifunctional unit, unequipped with dies and having no point of operation. Until plaintiff's employer provided a die and put the press to a specific use, its work area could not be adequately safeguarded

1. The pertinent inquiry in resolving a motion for judgment n.o.v. is "whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir. 1969). *See also Vizzini v. Ford Motor Co.,* 569 F.2d 754, 758 (3d Cir. 1977); *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1211–12 (3d Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). There is unquestionably more than sufficient evidence supporting the jury's verdict absolving Bliss of liability and plaintiff does not seriously contend otherwise. Accordingly, the motion for judgment n.o.v. will be denied without further discussion.

2. Plaintiff testified that he did not know what caused the ram to come down a second time. (Tr. 57). The parties generally agreed he either inadvertently stepped on the foot pedal while

his hand was within the work area or the machine "double tripped" without being activated (Tr. 58–59). However, because the press' alleged defect lay in the absence of safety devices and warnings and not in its possible malfunction, the resolution of this question was not explored at trial and is not relevant here.

3. Shortly after suit was instituted, defendant filed a third-party complaint against Penn. By order dated September 23, 1977, I granted Penn's motion to dismiss.

4. In his complaint, plaintiff set forth claims premised upon negligence and breach of warranty in addition to strict liability. *See Complaint* ¶¶ 7, 8 (Docket No. 1). At trial, he elected to proceed exclusively upon a strict liability theory (Tr. 199).

since the efficacy of any safety measure depends in large part upon the manner in which the machine is used. In short, defendant argued that the responsibility for providing point of operation safeguards necessarily rested with the Penn Construction Company and defendant therefore could not be held liable simply because the press in question was not so equipped.

Following a five day trial on the issue of liability, the jury returned a verdict absolving defendant of responsibility for the accident. The plaintiff then filed the present motions. He first contests that portion of the charge in which I instructed the jury that it could determine the punch press was not a completed product when it left defendant's hands but was only made complete by the addition of the die and certain other features by the Penn Construction Company. (Tr. 533, 536). I further advised the jury that if it did find the press was not a completed product when sold by the defendant, it could consider such factors as trade custom, safety codes, laws and regulations, the relative expertise of the parties, and the practicalities of the situation in determining who was responsible for providing point of operation safeguards. (Tr. 533–36).

The plaintiff's threshold challenge to this charge may be summarily disposed of. He contends my instruction to the jury that it could determine the punch press was not a completed product when it was sold to Penn permitted the defendant to be absolved of liability by a finding that the press was not a product within the meaning of section 402A. This argument mischaracterizes the substance of the charge. I did instruct the jury that if it found that the press was not a completed product when sold, it would then have to determine whether defendant or Penn was responsible for providing the point of operation safeguards. In no way did I intimate the mere finding that the press was not a complete product would absolve defendant of liability or that the strict liability provisions of section 402A would be inapplicable.

The plaintiff's more substantial contention is that I erred in instructing the jury that if it found the press was sold in an uncompleted state, it could consider such factors as trade custom, practicality, safety codes, and the relative expertise of the parties in determining who was responsible for providing safety features. As I stated to the parties at trial (Tr. 550), this portion of the charge was based upon *Verge v. Ford Motor Co.*, 581 F.2d 384 (3d Cir. 1978). In *Verge*, Ford Motor Company manufactured the cab and chassis of a truck. Another manufacturer constructed the body of a garbage truck upon the chassis. The plaintiff, who was injured when the truck backed over him, sued Ford alleging that the absence of safety features such as rear view mirrors and warning devices which would sound when the truck was put into reverse gear rendered the truck defective. The court was thus confronted with "a little-litigated subtlety of products liability law: On whom to place design responsibilities where a product has been manufactured and assembled in more than one stage." *Id.* at 385. In making such a determination, it posited the consideration of several factors:

1. Trade Custom—at what stage is the safety device generally installed;

2. Relative Expertise—which party is best acquainted with the design problems and safety techniques in question;

3. Practicality—at what stage is installation of the device most feasible.
*Id.* at 387.

In the instant case, the entire basis of Bliss' defense was that the punch press, as manufactured and sold to Penn, was simply a general purpose device which would ultimately be incorporated into a metal forming system. (Tr. 347). It had no point of operation and could not be put to use until the purchaser outfitted it with a die and whatever other features were necessary for it to perform one of the thousands of functions of which it was capable. (Tr. 371–73). In short, there was sufficient evidence for the jury to determine that, like the garbage truck in *Verge*, the punch press

in question was manufactured and assembled in more than one stage. Thus, there was no error in instructing the jury that it could find the press was not a complete product when sold to Penn.

Having so charged the jury, I then instructed it that if it found the press was not a complete product when sold, it would have to determine whether defendant or Penn was responsible for providing safeguards around the point of operation. I told the jury that in making this determination, it should consider such factors as trade custom, practicality, safety codes, and the relative expertise of the parties—language taken almost verbatim from *Verge*. Plaintiff contends however, that several subsequent decisions, specifically *Heckman v. Federal Press Co.*, 587 F.2d 612 (3d Cir. 1978) and *Holloway v. J. B. Systems, Ltd.*, 609 F.2d 1069 (3d Cir. 1979), have rendered *Verge* inapposite to the factual circumstances presented here. I cannot agree.[5]

*Heckman* involved a punch press accident quite similar to the one involved in this case. In holding its earlier decision in *Verge* did not absolve the manufacturer of liability as a matter of law, the court stated:

Finally, the defendant relies upon this court's recent decision in *Verge v. Ford Motor Co.*, 581 F.2d 384 (3d Cir. 1978). In that case, the court was confronted with the question whether the primary manufacturer of a product should be held liable for a design defect when secondary manufacturers also made substantial contributions to the finished product. The problem posed was allocating liability among parties who participated in the design and creation of the product—not, as here, where the product has been sold in its finished state and the purchaser is a party. Thus, the cases are distinguishable and *Verge* is not controlling here.

*Heckman, supra*, 587 F.2d at 617. Here, by contrast, there was considerable evidence that both the defendant and Penn made substantial contributions to the creation of the finished punch press that caused plaintiff's injuries. Thus, the necessary factual predicate for the application of the *Verge* standards was clearly present and *Heckman*, by its own terms does not hold otherwise.

Plaintiff's reliance upon *Holloway* is similarly unavailing. In that case, the Court of Appeals admonished District Courts "that negligence concepts such as 'trade custom'

**5.** I note also that in *Atkins v. Blaw Knox Foundry and Mill Machinery, Inc.*, 483 F.Supp. 1201 (W.D.Pa.) aff'd mem., 639 F.2d 771 (3d Cir. 1980), Judge Snyder gave extended consideration to the application of the *Verge* standards in a factual context not unlike that presented here. In *Atkins*, the plaintiff was injured while operating a bar straightening machine. He sued its manufacturer contending that the absence of a feed-in trough table rendered the machine defective. The defendant introduced evidence to the effect that in the trade it was customary for manufacturers to sell straighteners and feed-in tables separately and that plaintiff's employer had considerable expertise in the installation of feed-in tables. The court determined, however, that *Verge* was inapplicable and that these considerations did not derogate from defendant's liability as the manufacturer of a defective product.

We do not believe, however, that *Verge* is applicable to the present case. First, here we are not concerned simply with the absence of a safety device, but rather the absence of a piece essential to the operation of the machine. The Plaintiff's expert emphasized that the bar straightener could not operate without an adequately designed feed-in table—an essential and integral part of the functioning of the bar straightener. We note that the excessive whipping of a bar during normal use was prophesied by the manufacturer in its own literature, but then the manufacturer failed to provide either the table or the design which might have absolved the manufacturer. Second, and on a related vein, the straightener was sold in a "finished state", i.e., no substantial modifications of the product by down-the-line manufacturers or users was contemplated.

*Id.* at 1206–07. (footnote omitted).

It is clear that the application of *Verge* to the facts of the instant case was appropriate for the precise reasons that it was deemed inapposite by Judge Snyder. As has been discussed, there was sufficient evidence from which the jury could have determined that the press was not a finished product when defendant sold it to Penn. Moreover, the alleged defect here was the absence of safety devices and not the absence of a piece essential to the operation of the machine.

or 'reasonable care' have no place in suits brought under § 402A as that section has been interpreted by the Pennsylvania courts." *Holloway, supra*, 609 F.2d at 1073. It is contended that under *Holloway*, the admission of evidence of trade custom in a products liability action is *per se* erroneous thus requiring a new trial in the instant matter. This argument is not persuasive. In *Holloway*, the plaintiff was injured when a pressurized vacuum tank exploded. He contended the tank was defective because the manufacturer had not attached warnings to the tank advising the user that it should not be pressurized. The trade custom evidence was received in order to show that other similarly situated manufacturers did not provide such warnings. Hence, the evidence went to the *reasonableness* of the manufacturer's failure to provide adequate warnings. The court determined the admission of trade custom evidence *for that purpose* contravened the position of the Pennsylvania Supreme Court that negligence concepts such as reasonableness and due care have no place in a products liability action. *See Azzarello v. Black Brothers Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978).

█ Here, however, the jury was not charged that it could consider the evidence of trade custom as bearing upon the reasonableness of defendant's failure to provide point of operation safeguards. It was clearly and carefully instructed [6] that such evidence was to be considered, in conjunction with a variety of other factors, in determining on whom to place liability if it found the press had been manufactured and assembled in more than one stage. *See Verge, supra*, 581 F.2d at 385; *Orion Insurance Co., Ltd. v. United Technologies Corp.*, 502 F.Supp. 173, 177 (E.D.Pa.1980). Thus, the charge in this case did not impermissibly "ring of negligence," *Azzarello, supra*, 480 Pa. at 555, 391 A.2d at 1025 quoting *Cronin v. J. B. E. Olson Corp.*, 8 Cal.3d 121, 133, 104 Cal.Rptr. 433, 441, 501 P.2d 1153, 1162 (1972) and I therefore conclude there was no error in my instructions to the jury.[7]

6. What I specifically said was:
The defendant contends that the punch press that it manufactured was not a completed product in and of itself. The defendant contends that in order for this press to operate it was necessary for the user to add the necessary die, the pieces to the bolster plate and to the ram. According to the defendant, a press is merely a part of a metal forming system; it is not a finished product in and of itself. Now, if you accept the defendant's contention you are then going to have to consider on whom the responsibility lies to provide any necessary point of operation safety devices. And in that regard you can consider four factors.
(Tr. 533). I then enumerated and described the various factors set forth in *Verge* and concluded by telling the jury:
As originally provided, it had no point of operation, at least as I recall the evidence. Thus, you are going to have to decide whether it would be practical for Bliss to put in some sort of guarding device for point of operation. Therefore, if you conclude, and I'm not saying you will, but you may, if you conclude that the press was not a finished product, but was only part of a system which was really completed by the addition of the dies and whatever else Penn Construction may have done to it, you can consider the four factors that I have referred to in determining where the responsibility lies for providing such warnings—excuse me, providing

such safety devices as should have been on the press if it was otherwise defective without such safety devices.
I said the fact[ors] you may consider [are] the trade custom, the applicable safety codes and laws and regulations, the relative expertise of the parties and finally the practicality of the situation.
(Tr. 536).

7. The plaintiff posits two additional challenges to the jury instructions, both of which may be dealt with summarily. He contends I erred in charging the jury that if it did not believe his testimony that if the machine had been provided with warnings he would have been more careful in operating it, the absence of such warnings might not have been a cause of his injury. He further argues I erred in telling the jury that if it believed the testimony of Thomas Gianni, a Penn employee, that he understood it to be Penn's responsibility to provide point of operation safeguards, it could find that defendant's failure to send Penn safety instructions was not a cause of the accident. Plaintiff did not object to either of these instructions at trial and therefore cannot now raise them by posttrial motion. Fed.R.Civ.P. 51; *McCarthy v. Silver Bulk Shipping Ltd.*, 487 F.Supp. 1021, 1032 (E.D.Pa.1980). Further, the contested instructions cannot reasonably be viewed as constituting "plain error" such that a new trial would be warranted notwithstanding plaintiff's failure to

■ The plaintiff's remaining contentions pertain to several of my evidentiary rulings. He first argues I erred in permitting the defendant to introduce the 1971 American National Standards Institute ("A.N.S.I.") requirement B11.1 which placed the responsibility for installing point of operation safeguards upon the employer. (Tr. 158). It is plaintiff's contention that safety standards promulgated in 1971 are irrelevant to the issue of whether the press was defective when it was manufactured in 1954. I am not persuaded by this assertion. In accordance with *Verge*, the jury was instructed that among the factors it could consider in determining who was responsible for providing point of operation safeguards were the standards set forth in safety codes and regulations. (Tr. 534). The 1948 A.N.S.I. standards, which were in effect when the press was manufactured, did not explicitly place the responsibility for providing such safety devices upon any one party. Hence, the express mandate of the 1971 standards placing this obligation on the employer was relevant to the jury's determination in that it served to clarify the somewhat ambiguous standards promulgated in 1948.

■ After the 1971 standards were published, defendant undertook to mail a pamphlet entitled "B11.1 As We See It" to all of its known punch press users. The purpose of the mailing was to notify these users of their responsibilities under the revised A.N.S.I. standards. The plaintiff argues that the pamphlet was irrelevant to a determination of whether the punch press was a defective product and I therefore erred in admitting it during redirect examination of James A. Lewis, a Bliss employee. While I agree that the pamphlet did not directly relate to the issue of whether the punch press was defective, it was relevant to a matter broached by plaintiff's counsel during his cross-examination of Mr. Lewis. During his examination, counsel repeatedly raised the question of defendant's alleged indifference to the fact that employers were failing to provide adequate safeguards on its presses and that the unguarded presses were causing numerous injuries. (Tr. 239–45; 248–50, 253, 262–63). I therefore permitted the defendant to introduce the pamphlet on redirect examination to rebut plaintiff's assertions about its business practices. Since the evidence was pertinent to a collateral issue repeatedly raised by the plaintiff himself, I conclude that there was no error in permitting its introduction.

■ The plaintiff next contends I erred in refusing to permit him to cross-examine Mr. Lewis about a pamphlet that Bliss began sending to its customers in 1967. The pamphlet, entitled "Safety Precautions and Suggestions," detailed a number of ways for the user to safeguard the operation of the press. Plaintiff argues the pamphlet represents a subsequent remedial measure which was admissible under Fed.R.Evid. 407 to prove both defendant's awareness that its customers were not equipping the presses with adequate safety devices and the feasibility of providing such customers with safety instructions. Even accepting plaintiff's assertion that this pamphlet might properly have been admissible under rule 407, I concluded at trial and I reiterate here that its probative value was outweighed by its potentially prejudicial impact and it was therefore properly excluded under Fed.R. Evid. 403.

In his opening statement, defendant's counsel made clear his intention to call Thomas Gianni, an employee of Penn Construction Company, to testify he believed Penn to be responsible for providing point of operation safeguards and that it failed to do so simply because it was not economically feasible. (Tr. 208). In view of this representation I refused to allow the introduction of the pamphlet because if Gianni did so testify, it was clear the receipt of safety instructions by Penn would have been irrelevant to its failure to equip the press with adequate safety features. I did, however,

make timely objections. *See Herman v. Hess Oil Virgin Islands Corp.*, 524 F.2d 767, 772 (3d Cir. 1975).

grant plaintiff leave to renew his request if Gianni's testimony did not comport with counsel's opening statement. (Tr. 295). Significantly, no such request was made. Gianni did testify he understood it was Penn's responsibility to outfit the press with safety devices and that it failed to do so because it could not afford them. (Tr. 314). In light of this testimony, it is abundantly clear that the pamphlet's probative value was minimal. Penn was already aware of its obligation to provide point of operation safeguards and failed to do so for purely economic reasons. Thus, whether defendant could have or should have forwarded Penn the instruction manual is simply not relevant to the fact that the press in question was not equipped with safeguarding. I did not err in refusing to permit plaintiff to introduce this evidence.[8]

Finally, plaintiff contends I erred allowing Gianni to testify that he understood it to be Penn's responsibility to provide point of operation safeguarding. (Tr. 314). This testimony clearly pertained to practicality and the custom of the industry which, under *Verge*, was relevant to the jury's determination of who was responsible for providing the safety devices.

For all of the foregoing reasons, plaintiff's posttrial motions will be denied.[9]

---

**8.** It is worth noting that I did permit plaintiff's counsel to cross-examine Mr. Lewis at length about warning placards which defendant began attaching to its presses around 1967. (Tr. 296–99).

**9.** In addition to the specific arguments considered in this memorandum, plaintiff contends generally that the jury's verdict was against the weight of the evidence·thus warranting a new trial. I have carefully examined the record in its entirety and am unable to agree that the jury's verdict was against the great weight of the evidence. Accordingly, plaintiff's contentions in this regard must be rejected. *See Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 187 (8th Cir. 1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973).